# BAKER *v.* CUMMINGS.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 189. Argued January 14, 17, 1898. — Decided February 21, 1898.

*Stuart* v. *Hayden,* 169 U. S. 1, affirmed to the point that when two courts have reached the same conclusion on a question of fact, their finding will not be disturbed unless it be clear that their conclusion was erroneous.

*Metropolitan National Bank* v. *St. Louis Dispatch Co.*, 149 U. S. 436, affirmed to the point that courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statutes of limitation which govern actions at law.

In this case the court arrives at the conclusion, on the evidence, that if the false representations as to the earned fees were made by Baker as alleged, there was entire knowledge thereof by Cummings more than three years before the filing of his bill, which is the time in which an action at law for such a cause is barred in the District of Columbia, and that the conduct of Cummings, in permitting Baker to go on and prosecute the claims as if they were his own, debars him from proceeding in a court of equity; but in so holding the court must not be considered as intimating that it concludes that there was either clear and convincing proof, or even a preponderance of proof, that the sale was as claimed by Cummings.

THIS suit was commenced by appellee Cummings on Febru-

ary 1, 1890, by a bill filed on the equity side of the Supreme Court of the District of Columbia against Baker, the appellant. In substance, the bill set forth the formation about the year 1874 of a partnership between Cummings and Baker for the practice of law in the city of Washington; that the expenses were to be borne and the profits shared equally between the partners; that the firm some years thereafter became attorneys for the collection of claims against the United States in favor of certain inspectors of customs for arrears of pay claimed to be due them. It alleged that on September 6, 1886, Cummings sold to Baker all his interest in the fees earned but not then divided, and those yet to be earned from such claims, and that there was consequently a dissolution of the partnership as to these matters, but that it continued as to all other business until September, 1889, when the partnership was dissolved. The object of the bill was to procure a cancellation and annulment of the sale of the fees in inspector cases made as above stated and of the written instrument of assignment by which it was evidenced, on the ground of false representations claimed to have been made by Baker to Cummings in the negotiations for the sale, which representations were averred to have brought about the consent to the sale and the execution of the assignment to carry out the same. The fraud specified was, in substance, this: That Baker had misrepresented the amount of the fees then actually earned by the firm and undivided between the partners on the inspectors' claims, for which appropriations had then been made by Congress, by stating to Cummings that the then earned fees only equalled about $20,000, when in truth and in fact they were, to the knowledge of Baker, about $32,000; that as to the future claims then in the hands of the firm but not then allowed by the Treasury Department or appropriated for by Congress, Baker had knowingly largely understated the amount thereof by representing them to be only $80,000, when in fact they then amounted to about $275,000. The relief prayed was an annulment of the sale; a full settlement of the partnership affairs, treating the fees in the inspector cases as being a part of the partnership assets; and in aid of the final settlement which

was asked, there was also a prayer that Baker be enjoined from prosecuting an action instituted by him against Cummings, in December, 1889, to recover $2712.81 and interest, it being averred that Baker's right to this amount was involved in a settlement of the entire partnership affairs.

The answer of Baker denied that there had been any fraud practised upon Cummings in the purchase of his interest in the fees in the inspector cases, and the alleged misrepresentations as to both classes of fees, whether earned or to be earned, was expressly denied. The averment, that the complainant had sold his interest in the fees on a basis of his ownership of one half therein, was directly traversed, and on the contrary it was alleged that the assignment resulted from the following circumstances and had been made upon these conditions : That the existence of claims by inspectors of customs against the Government had been discovered by Baker, and that he had procured the business of prosecuting them for the firm for a compensation, in most cases, of twenty-five per cent of the sum collected, and had substantially by his own labors pressed them to a successful issue, and that the result of his exertions had been to earn for the partnership a considerable sum of money, which had been, prior to 1886, divided between the partners equally ; that during the course of the business Cummings had given little or no attention to the inspectors' claims, but on the contrary had neglected not only these claims, but the partnership affairs generally ; that, in consequence of these facts, for months prior to September, 1886, Baker had determined to put an end to the partnership, and had so informed Cummings ; that for the purpose of preventing this dissolution and securing a continued association with him (Baker) in business, which Cummings desired, an agreement had been entered into between the partners that Cummings, instead of taking an equal interest in the earnings of the firm from the inspectors' cases, should dispose of his rights therein on the basis of his having only a one-third instead of a one-half interest ; that on this agreement, as to the proportion in which the partners should be entitled to the fees, and Cummings's judgment of the future result of claims unallowed and unap-

propriated for, which were in their very nature largely conjectural, the sale was made for a consideration of $15,000 cash to be paid by Baker to Cummings, the latter to retain in addition the full amount of all fees due to him for his services as assignee of an insolvent banking firm, which latter amount, without the release, it was averred, would have been an asset of the partnership, and was estimated to equal $10,000, of which Baker's share would have been one half.

The answer, moreover, averred that at the time of the sale Cummings had full information of the condition of the business in the inspector cases and dealt with his eyes open ; that as a partner he was not only familiar with the general manner in which the business was conducted, but also, about two weeks prior to the sale, he received from Baker papers and documents which fully informed him of the exact condition of the claims, his interest in which it was proposed to sell, the papers and documents in question having been handed to Cummings during the pendency of the negotiations in order that he might ascertain the precise situation.

In addition, the answer averred that immediately after the sale, and before Cummings- had cashed a check for $15,000, given him by Baker in payment of the amount of the purchase price, Cummings was put in possession of papers and documents which were acted upon by him, and which, if any fraudulent representation had been made in relation to the sale, fully informed him of the fact in ample time to have protected his interest : and although this full information was given him, before the purchase price was collected, Cummings made no pretence of any deceit practised upon him, or made any complaint as to the contract, but continued in the partnership as a member of the firm as to other business, and that the first complaint which was made by him of any unfairness in the transaction was nearly three years after the sale, and then only after Baker had insisted upon payment to him by Cummings of a sum which Baker claimed was due him, and had moreover expressed his unalterable intention to dissolve the partnership. The defence of the bar of the statute of limitations was specially pleaded.

At the hearing a decree was entered for complainant, and a reference was made to an auditor to state the accounts between the parties. Pending the hearing on such reference, an appeal from the interlocutory decree was prosecuted to the Court of Appeals of the District of Columbia, where a judgment of affirmance was rendered. 4 App. D. C. 230. Subsequently, on confirmation of the report of the auditor, a final decree was entered in favor of the complainant for the sum of $32,772.14, with interest thereon from the 1st day of July, 1895, until paid, in which sum was embraced a credit to Baker of the items claimed by him in his action at law against Cummings. From this final decree an appeal was taken to the Court of Appeals for the District, by which it was affirmed. 8 App. D. C. 515. This appeal was then taken.

*Mr. S. R. Bond* and *Mr. George F. Edmunds* for appellant.

*Mr. Franklin H. Mackey* for appellee.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

Before approaching a discussion of the issues which we deem it necessary to pass upon in order to conclude the controversy which the record presents, it will subserve the purpose of clearness of statement to give a brief outline of the proof as to matters about which there is no substantial controversy and to point to the controverted question, thus eliminating from view irrelevant contentions, and concentrating the attention on the material issues.

1. The existence of the partnership was established as alleged, and the fact that the claims of the inspectors had been unearthed by Baker, and had been mainly secured by him for the firm on a contingent fee of twenty-five per cent, and had been almost exclusively prosecuted by him, was established beyond question. That Cummings had not given any great attention to the business for several years, and that Baker was dissatisfied therewith and had threatened to dis-

solve the partnership many months before September, 1886, though not explicitly admitted by Cummings, was also conclusively established.

2. The sale of Cummings's interest in the inspector fees, both earned and unearned, for a consideration which embraced a cash payment of $15,000, was also established beyond dispute. That in the negotiations which preceded the sale Cummings contemplated something besides a mere division between himself and Baker in equal proportions of the rights of each in and to the fees, was also indisputably proven. This is testified to by Cummings himself as follows:

" I said, ' Mr. Baker, I make you this proposition : I will take one half fees in all the cases in which we have powers of attorney and contracts prior to the 1st of January, 1886, or I will take one third of all the fees in all the cases (leaving him two thirds), or I will take $15,000, as you offer, according to what you think is the best for me.' "

Undoubtedly, also, the proof establishes that when the sale was made the fees for cases allowed and appropriated for, then undivided, amounted to about $32,000, and that the claims subsequently allowed and appropriated for largely exceeded $80,000. From these conceded facts there arises a grave contention ; Cummings claiming that, as he was entitled to an equal share of the fees, he was led, by the misrepresentations of Baker, into making a seeming sale of his interest, receiving as a consideration virtually nothing but his own money ; Baker, on the other hand, contending that the transaction between the parties did not contemplate a mere division of their interest, but a sale by Cummings of his rights on the basis of his being entitled only to a one-third interest in the fees, in order to obtain a continuance of the partnership as to other matters, and that the sum of $15,000 and the right of Cummings to retain the assignee's fees before referred to, was fixed by Cummings, from his knowledge of the business and his investigations made at the time, as a fair equivalent for his agreed one-third right as above stated.

3. Nor does any real dispute exist as to the fact that when the active negotiations for the sale begun, papers were handed

Cummings by Baker, from which an understanding of the state of the whole business could have been derived; that these papers were taken home by Cummings and retained for several weeks until just before the sale was consummated. Whilst as to these facts there is no conflict in the proof, there is a controversy as to whether it was established that Cummings examined the papers carefully so as to put himself in possession of the information which might have been obtained from them; Cummings claiming that the papers were of such a confused nature that he could have arrived at an accurate knowledge only by inquiry, labor and investigation, which he did not make, as he preferred to rely upon Baker's special acquaintance with the status of the claims. Baker, on the other hand, claiming that he had no greater information than was accessible to Cummings, and that the latter dealt on the faith of his own knowledge and estimate, and not upon information derived from or representations made by Baker personally.

4. The proof also establishes, and there is no contention on the subject, that on the evening of the sale or the morning of the day following, Baker left the city of Washington for the State of New Hampshire; that he left Cummings in the office, and before going placed in his hands a document known in the record as Exhibit H. M. B., No. 3, to enable Cummings to look after any matters in the inspector cases which might require attention during his (Baker's) absence; that at the same time Baker left with Cummings the bank deposit book of Baker, with his check book containing signed and unfilled checks to be used as occasion required in the making of remittances or payments in the inspector cases; that Cummings acted upon this authority and made deposits of drafts collected from the Government, drew checks for amounts due claimants, and made entries indicating these latter facts upon the schedule in question; that at the time of Baker's departure Cummings had not cashed the check given him by Baker as the consideration for the sale, and that Cummings cancelled it, and on different occasions filled up three of the signed checks left by Baker, for the sum of $5000 each, and collected

the same, thus acquiring the consideration referred to. The proof further established that Baker remained absent for nearly a month, and on his return found Cummings in the office as usual; that they continued thereafter to occupy the same office, and that no complaint was made by Cummings as to the fairness of the sale until nearly three years thereafter, at which time Baker was pressing a claim against Cummings, and had told him that he was going to dissolve the partnership.

The controverted issue arising from the foregoing unquestioned facts is this: Cummings claims that he did not derive knowledge of the fraud he complains of from the matters just stated; whilst Baker asserts that if the fraud in the purchase complained of by Cummings had existed, full knowledge thereof was conveyed to Cummings by the facts above stated, and that the silence of the latter and his inaction for years, and until Baker had made claim for money and stated his intention to dissolve partnership, not only establishes the want of foundation for Cummings's assertion that there was misrepresentation and fraud in the sale, but also makes clear the fact that the right to make such claim was barred, both by limitations and laches, when the demand of Cummings was actually preferred.

It results from the foregoing that the facts as to the controverted matters are embraced in a narrow compass, and that the whole case really resolves itself into two issues: 1st. Does the proof establish that the purchase and sale in question was as claimed by Cummings, or as asserted by Baker? In that question is necessarily embraced the further one of whether Cummings, at the time of the sale, had actual knowledge of the fraudulent representations claimed to have been made by Baker. This is, in terms, included, because it would be impossible in reason to declare that one had been deluded or deceived by misrepresentations into entering into a contract if he had actual knowledge when the contract was made that the alleged inducing representations were false. 2d. Conceding that Cummings was misled by the fraudulent representations of Baker as alleged, did he immediately after the

sale, and before the collection by him of the cash considera-
tion of the sale, discover that the representations were untrue,
and thereby become aware that he had been grossly deceived
and defrauded, and did he, with such knowledge, say nothing
about the matter, collect the cash consideration, remain silent,
and continue in partnership with Baker, occupying the same
office for years, and only assert that he had been deceived
when a dissolution of the partnership was threatened and he
was pressed to pay a sum which Baker claimed Cummings
owed him? This latter inquiry assumes a twofold aspect, for
although in the bill, in the opinions below, and in the argu-
ment at bar, the efficient misrepresentation, which it is asserted
rendered the assignment void, was the fraudulent statement
as to the sum of the fees on the claims then allowed and ap-
propriated for, nevertheless it is also, as we have seen, asserted
in the bill and contended in argument that there was a mis-
representation as to the pending claims not yet acted upon
by the department, and which were then unappropriated for
by Congress.

* We will defer an examination of the testimony as to the
existence of the fraud and misrepresentation complained of
until we have passed on the charge that, if there was fraud
and misrepresentation, Cummings had full knowledge thereof
immediately after the sale. We adopt this order of considera-
tion because if it be found that such was the case, the question
whether the fraud originally existed will become immaterial,
in view of the defences of limitation and laches. Moreover,
in reviewing the question of knowledge, we will do so in the
order stated, that is, first, discovery of the alleged fraud and
misrepresentation as to the amount of fees collected and in
process of collection from claims appropriated for at the time
of the sale; and, second, discovery of the misrepresentation
as to the amount of pending claims from which further fees
were expected. Here, also, it is to be premised that if the
first proposition be found to be well taken, an examination of
the second will be wholly unnecessary. This, obviously, is
the case, for as the statute of limitations began to run from the
time when suit might have been brought to annul the sale, it

results that the discovery of the falsity of *any* material and fraudulent representation by which the sale had been induced, gave rise to the right to commence an action to rescind, and therefore fixed the period when the statute of limitations commenced its course.

I. — *Did the schedules left with Cummings the day after the sale, when Baker went off to New Hampshire, and which remained in the custody of Cummings and were practically under his control, convey to Cummings full knowledge that he had been grossly deceived as to the amount of fees collected, as alleged by him, if his statement that such false representation had been made was true, and did he remain silent for three years thereafter?*

In entering upon an analysis of the evidence upon this particular subject, we shall be governed by the principle determined by this court in numerous cases — of which *Stuart* v. *Hayden*, 169 U. S. 1, decided at the present term, is the last expression — that when two courts have reached the same conclusion on a question of fact, their finding will not be disturbed unless it be clear that their conclusion was erroneous.

To determine whether Cummings knew immediately after the sale, and before he had collected the price thereof, whether misrepresentations had been made to him and fraud practised upon him as to fees from cases then appropriated for, it is, of course, essential to see clearly what were the misrepresentations asserted to have been made, and what was the fraud claimed to have been perpetrated. They were, as alleged in the bill, that Baker, with a knowledge that the fees from the claims allowed and appropriated for were $32,000, had concealed the fact from Cummings, and represented that such fees were only equal to $20,000 or thereabouts. It is obvious then that the fraudulent representation alleged was not as to the amount of the claims allowed and appropriated for upon which the fee of twenty-five per cent was to be calculated, but as to the sum of the fees to arise from the calculation. And this is unmistakably established by the testimony of Cummings in his examination on the 29th of February, 1892, where he said, in describing the representation made by Baker to him:

" I asked Mr. Baker how many fees there were that were due us in cases that had been adjudicated and for which appropriation had been made, and which were then in the process of collection, and he said about $20,000, or not more than $22,000. I was somewhat surprised at that, and I so expressed my surprise to him; he said that our fees in some of those cases were not as much as usual; some only about 10, 15 or 20 per cent."

It is not reasonable to infer that surprise could have arisen as to the amount of fees if there had been no antecedent knowledge of the sum of the claims on which the fees were to be calculated. The fact that Cummings had approximate general knowledge of the amount of the claims is not only shown by the particular statement just cited, but by his declaration that he observed when appropriations were made, knew at the time that the appropriation of August, 1886, had been made, and also knew that practically all of the inspector cases were controlled by his firm. As all the fees earned which were embraced in the sale arose from claims covered by the appropriation made in August, 1886, it follows that these statements by Cummings and his admitted knowledge of the August appropriation taken together leave no doubt that Cummings was fully informed as to the sum of the claims from which the earned fees arose. Indeed, the possibility of any other view of the testimony is removed by a statement of Cummings subsequently made, and to which we shall hereafter more fully refer, in which he plainly says that he knew that the gross amount coming in on the basis of the usual compensation was $32,000, and supposed that the reduced amount arose from charges against it.

Now, then, the issue of fact to be determined is this: Could it have been possible for Cummings to have received the schedule in question on the morning after the sale, to have dealt with it, to have made entries on it at various times, without being informed that the fees of the firm were not less than 25 per cent in a sufficient number of cases to have justified any belief whatever that the sum of the fees was reduced from $32,000 to $20,000? The schedule left in his hands by

Baker contained seven sheets. In one column was the name of the claimant, in another the total allowance, in a third the fee, in a fourth the amount of the remittance to the claimant, in a fifth the date of the remittance, in a sixth whether remitted by check, in a seventh the number of the check, and in an eighth column the date of the check. The amount of the aggregate fees appearing on each sheet was added up and stated at the bottom of the column. With such total stated, the only act required to ascertain the aggregate amount of all the fees was to sum the footing of the sheets. And yet the want of knowledge by Cummings of the fraud is predicated upon the proposition that although these sheets were in his hands for nearly a month, while he was dealing with them making entries on them, he was so careless as never even to make the addition which would have conveyed to him absolute knowledge of the fact that the fraud had been committed. But even the addition was not necessary, for if the fraudulent misrepresentation was made, it was not, as we have seen, as to the gross amount, but as to the net fees to be realized from the gross amount, that is, that the diminished amount arose from the fact that in the cases on the schedule the firm was getting less than 25 per cent. But on the sheets, in the column of fees immediately next to the column of amount allowed, the sum of the fee in each case was stated, and no eye could even casually look at the schedule without observing that nearly all the fees were stated therein at the rate of 25 per cent, and not at a diminished rate. However, to hold that Cummings did not derive knowledge from the schedule, the reasoning must go yet further. Out of 106 names on the schedule, there were only five where the fees stated were less than 25 per cent, and in four of these five cases the fact that the fee was a reduced percentage was made evident by the statement expressed in figures immediately opposite the name of the claimant, giving the exact percentage upon which the fee was calculated. The mind, then, is driven to the conclusion that the testimony beyond doubt establishes that Cummings knew immediately after the sale and before he collected the price that Baker had made to him a gross and wilful misrepresentation, if the

statement was made by Baker to which Cummings testifies, and which he asserts operated to induce him to part with his interest.

Overwhelming as is the proof that the schedule conveyed to Cummings the knowledge of the fraud if it had been perpetrated, such fact is unquestionably shown by Cummings's further testimony. At a subsequent stage of his examination when he was questioned on the subject and his possession of the schedule had been developed, he frankly admitted that his possession of the schedule and his dealings with it had informed him that Baker's representation which he swore had been made about the diminished percentage was untrue, but that he had on such discovery lulled himself into security by the belief that there must have been another reason for Baker's statement of the reduction in the amount of fees, that is, the large sums which Baker might have had to pay out to other attorneys, and presumably under this belief he remained silent. We extract a question and answer bearing on this subject:

"Q. Now, then, your check was paid in that way. When did you first obtain any knowledge as to the amount of claims which had been collected by Baker upon the first class of cases — I allude to the class of cases in which he said there were from $20,000 to $22,000 in fees, the cases in which appropriation had already been made; and you may also state at the same time when you first discovered in regard to the other class of cases in which no appropriation had been made — when you first discovered the amount?

"A. The amount of the claims that had been adjudicated and which were in the process of collection I discovered, of course, within a day or two after Mr. Baker had delivered me the schedules, and I continued the collections, because these schedules contained the name, the amount, the fee and all the data pertaining to each case, and it was hard for me to reconcile the amount of fees that he said and the amount of fees that were on the schedule, and I know often we had to pay out a large amount of our fees to other attorneys, as I frequently had paid one half of a fee to a local attorney to work

up the evidence, and I had supposed the great diminution of these fees from what I supposed, viz., $32,000, in the vicinity of $30,000, was owing to the division with other lawyers. It has been my habit in a number of cases — I write down my ideas of things, and on that occasion I sat down and I made a private memorandum for myself, giving my impressions of the matter, wondering as to whether I had done the best or not and wondering if the facts were — "

However unreasonable may be this explanation, and however natural is the inference that, if Cummings had discovered that his partner had made a gross misstatement to him and defrauded him, he would not have completed the sale by collecting the consideration, but would have called his attention to the facts when the partner returned a month after, need not be discussed since the reason given by Cummings for his conduct is rendered wholly nugatory by another consideration, which is this: The seventh of the sheets left in the custody of Cummings contained a statement of the sums to be paid to other attorneys by the firm on the claims mentioned in the schedule. The form of this sheet was slightly different from that of the others. It showed the name of the attorney to whom the fee was due, in the next column in what case the fee was due, in the third column the date of the remittance of the fee, in the fourth column whether remitted by check, and in the fifth the date of the check. Now, if, as demonstrated by the proof and as admitted by Cummings himself in his second statement, his dealings with and relations to the schedule conveyed to him knowledge that there was no truth in Baker's supposed representation as to reduced percentages coming to the firm, how in reason can it be denied that knowledge that the amount could not have been materially reduced by fees paid to other attorneys must have also been conveyed to him when the schedule plainly showed the fact as to the amounts to be paid other attorneys and that they aggregated less than $1500. Indeed, it is justly to be inferred from the testimony that, as the facts shown by the schedule were developed and Cummings's memory was refreshed by the examination thereof, his mental condition changed, and he reached the

conclusion that he had been previously mistaken in saying that, although the schedule had informed him of the amount, he had been lulled into security, since he subsequently swore that the schedules gave him no information whatever, because he did not look at them at all. His statement to this effect is as follows:

"When Mr. Baker handed me that paper and called my attention to the fact that all had not been collected, and that quite a number of payments were still to be made, I simply put it in my desk; I paid no attention to it, because I considered the trade was made. I had nothing to do with it, but simply took that paper, and when a power of attorney would come in with power to cash the draft I would make the proper entry, but it never came into my head that there was anything wrong about it. I considered that I had sold out to Mr. Baker for a fair consideration. I had no idea that I was being paid with my own money."

So, also, on cross-examination in rebuttal, the following question was asked and answer given by complainant:

"Q. Mr. Cummings, you have stated that Exhibit H. M. B., No. 3, (the schedule we have been referring to,) in answer to a question by Mr. Claughton, was in your possession, and that you paid no attention to it and put it aside. You did not take enough interest in it to go over it and see what it was?

"A. The transaction was closed, as I supposed."

Again, after being cross-examined at some length and being called upon to explain his delay in instituting the present proceedings, and after he had stated that in 1886 he knew of the fact of the appropriation in August of that year by Congress, he was asked to state if he had discovered any facts in 1888 in relation to the appropriation of 1886 which he did not have in 1886. The reply was:

"A. I knew no more about the standing of the appropriations of 1886 for these cases and of the settlements thereunder for two years after those settlements were made; in other words, I had no knowledge of the appropriation of 1886 until my suspicions were aroused in 1888. *I supposed it was all fair and square.*

"I don't know that I learned anything in 1888 of conse-quence about the appropriation of 1886, but it was only when the three appropriations, amounting to about $240,000 in 1888, instead of the $80,000 as was represented to me, that I began to inquire into the matter, and my knowledge of the appropria-tion of 1886 and of the fees thereunder was gained by taking the appropriation of 1886 and going into the First Auditor's Office and seeing what drafts were delivered to Mr. Baker or Cummings, or Cummings and Baker, under the appropriation of 1886. When I had gotten the list of those drafts I got the correct amount of them.

"I think it was in the fall or winter of 1888 or 1889 when I got the list. I did not get a list; I made a list and I went back to my office and I took the Treasury executive document containing the allowances of those cases, and I estimated, as far as I could, and I believe that I am correct, that Mr. Baker received $135,000 on the claims of 1886.

"I don't remember now that I knew anything about the ap-propriation of 1886, intervening between 1886 and 1888, though I may have done so, but I do not remember it."

But the "list" referred to did not give him as much infor-mation as was contained in the schedule which was handed to him immediately after the sale, and which he had in his sole custody for more than three weeks. Nor can the statement of the witness that the schedule was not looked at, overcome the inherent probabilities as to the knowledge which must have been conveyed, in view of their contents, of the length of time they were in Cummings's possession, of his entries thereon and dealings therewith, and, above all, his previous sworn statement. In other words, the last statement that knowledge was not conveyed by the schedule cannot be taken as true without repudiating the previous declaration that the schedule had given the knowledge, but that its so doing did not excite suspicion, for a reason which the schedules them-selves show could not have existed.

From the record we infer that this result must have pro-duced an impression on the mind of Cummings, for, later on in his examination, when his attention was called to the fact that

if he had been deceived by Baker as to the sum of the fees when the sale was made, he could not have escaped discovering it when the schedules were handed him after the sale, he again changed his position and declared that he did not then take any action because the discovery of the misrepresentation as to the amount of the fees earned had not excited his suspicions, because of the immateriality of such misrepresentations.

" A. I am not going to give ideas, but simply facts. My whole idea as to whether I had made a poor trade or not had nothing to do with the amount of fees received in 1886, but solely and entirely on account of the future business that would come in; when Mr. Baker had told me that there was only $75,000 or $80,000 more of cases, out of which there would be a possible $20,000 of fees, I did not know whether that was correct or not, and, as I stated, I could not tell, but time alone would tell."

The situation, then, is this : Looking at the case, as made by the testimony of Cummings, it is impossible to avoid reaching two conclusions; 1st, that Cummings knew the exact condition of the earned fees shortly after the sale, and knew also that he had been grossly deceived if his statement of the transaction was the true one, and that with this full information he collected the price of the sale and remained quiescent for three years without complaining and without attempting to have the wrong rectified ; 2d, that this conduct on his part is first attributed to one cause, and then to another and conflicting one. When both of these explanations are shown by the proof to be untrue, then the matter is finally explained by him by the statement that on the discovery of the facts he so acted, because he attached no importance whatever to the amount of the fees earned at the time of the sale, and considered that he had not been defrauded by the untrue representations which he asserted had been made in reference thereto. But the bill of complaint, as we have seen, proceeds, and the judgments below rested, upon the theory that the representation as to the amount of the earned fees at the time of the sale was the most material ground for rescinding the contract.

Our conclusion is, that the evidence not only clearly but beyond all question or dispute overwhelmingly shows that if the false representations as to the earned fees were made as alleged, there was entire knowledge thereof by Cummings. And, for reasons heretofore stated, this conclusion renders unnecessary any inquiry into the question of when Cummings discovered the falsity of the alleged representations as to the amount of pending claims.

The question which arises is: Can Cummings invoke the aid of a court of equity to afford him the relief which he seeks? A negative answer is compelled by a consideration of the most elementary principles.

As said in *Metropolitan National Bank* v. *St. Louis Dispatch Co.*, 149 U. S. 436, 448: "Courts of equity, in cases of concurrent jurisdiction, consider themselves bound by the statutes of limitation which govern actions at law." That Cummings might at his election have pursued a remedy for the alleged fraud in a court of law is obvious. And it is equally clear that such remedy at law, by action on the case predicated on the facts as to deceit and fraud, which are alleged in the bill now before us, would have been barred in three years from the discovery of the fraud under the Statutes of Limitation of Maryland of 1715, c. 23, § 2, in force in the District of Columbia. 1 Kilty's Statutes, 111; Comp. Laws Dist. Col., c. 42, § 6, p. 360. It hence follows, irrespective of the equitable doctrine of laches, that the relief which the bill seeks to obtain ought not to be allowed by a court of equity.

Apart, however, from the bar of the statute of limitations, the facts as to the full knowledge of the fraud, if any existed, by Cummings more than three years before the filing of his bill, and his conduct after he obtained it, his permitting Baker to go on and prosecute the claims as if they were his own, debars Cummings from invoking a court of conscience to put him in a much better position than he could possibly have occupied if he had spoken and asserted his rights in due season.

There cannot be a doubt that the right existed in Baker to have dissolved the partnership at any time. If this right on his part had been exercised, Cummings would not have been

in a position to have availed himself of the labors of Baker in prosecuting the future claims to a successful culmination, and would not therefore have been a participant in the profits arising therefrom. If with a full knowledge of the fraud Cummings chose to remain silent, to permit Baker to go on with the prosecution of the claims, to incur the expenditure of time and labor not only in the cases in which he was successful but in the cases in which he failed, Cummings cannot in conscience be allowed to reap the rewards which he could not possibly have obtained had he spoken with reasonable promptness. when the knowledge of the fraud if it existed was brought home to him in the most pointed and unequivocal way.

These broad considerations of equity and justice were not applied below because it was deemed that the occasion for their enforcement had not arisen, for two reasons: First, because it was thought that even if Cummings discovered the fraud in ample time to have availed himself of his rights, he was lulled into not doing so by his faith and confidence in Baker and his disinclination to believe that Baker had perpetrated so gross a fraud upon him. Second, because it was said as Cummings's share of the earned fees, upon the theory of a half and half division, was equal to the price which he received, there was no consideration for the sale, and the transaction was wholly void, hence there was no room for the application either of the statute of limitations or the doctrine of laches. In other words, that the partnership continued as to the inspector claims just as if no sale had been made. And the doctrine was carried to its logical outcome, since the judgment below awarded to Cummings a share in the fees earned by Baker, from contracts not under the control of the firm at the time of the sale of the interest in the inspector cases, but which were acquired by Baker thereafter.

But neither of these views meets our approbation. The first is completely answered by the fact that the analysis of the evidence which we have made conclusively establishes that if the fraud was perpetrated as alleged, the fullest knowledge was conveyed to Cummings more than three years before he brought his suit. Under this state of facts the

reasoning comes then to this, that there is no doctrine, either of limitation or of laches, applicable to a case of alleged fraud even although the party obtains almost at once full knowledge thereof, if he choose without due reason to affirm that he did not act because he was unwilling to believe his own senses. Reduced to its ultimate deduction, the proposition maintains this doctrine, that if one against whom a fraud has been perpetrated and who thereafter is in all respects fully informed of its nature and extent, chooses not to act, his so electing may continue indefinitely, provided only he declares not that he did not know, but that knowing he did not believe.

The second proposition, conceding *arguendo* the facts are as it assumed them to be, that is, that the price was paid Cummings from his own money, leads in reason to an equally impossible result, since its consequence is substantially to affirm that neither limitation nor laches can be applied in equity when from a given view of the proof it is considered that a fraud has been committed of such a nature as to avoid a contract. That this is the logical outcome of the proposition is shown by its application to the case under consideration. Whether or not Cummings was paid by his own money depends upon an analysis of the facts and a finding as to their preponderance. If the theory of Baker be true that the contract contemplated a division between the partners as to the claims in question, not upon the basis of one half each, but upon the basis of two thirds to Baker and one third to Cummings, because the claims had been largely realized by the efforts of Baker, and because, as a consideration for so dividing, Baker agreed as to other business to continue the partnership with Cummings when otherwise he would have dissolved, there can be no pretence for the claim that Cummings was paid with his own money. To say, then, that Cummings was paid by his own money necessitates deciding that the fraud was established as alleged by Cummings. But the principle by which the bar of the statute of limitations is enforced by a court of equity and upon which the doctrine of laches rests is that equitable powers will not be exercised to discover whether one has been wronged when, with full

knowledge of the alleged wrong, he has allowed the bar of the statute of limitations to arise, and has slept upon his rights until such a situation has arisen as to render it inequitable to afford him relief. By the effect of the proposition referred to these principles are subverted, and a new doctrine arises which may be thus stated: A court of equity will not grant relief against fraud where the one against whom the fraud has been committed has, after its discovery, allowed the bar of the statute of limitations to be accomplished, unless there has been fraud, and if there has been such fraud neither laches nor limitation can ever apply.

Because we rest our conclusions upon the application of the bar of the statute and the laches of Cummings, we must not be considered as intimating that we conclude that there was either clear and convincing proof, or even a preponderance of proof, that the sale was as claimed by Cummings.

*It follows that the decree of the Court of Appeals of the District of Columbia must be reversed, and the cause be remanded to that court, with directions to set aside the decree of the Supreme Court of the District of Columbia, and to remand the cause to that court with instructions to dismiss the bill, and it is so ordered.*