## WINN et al. v. SHUGART et al.
### No. 2033.

Circuit Court of Appeals, Tenth Circuit.
May 29, 1940.

Rehearing Denied July 8, 1940.

618

Warwick M. Downing, of Denver, Colo. (Joseph L. Dailey, of Albuquerque, N. M., on the brief), for appellants.

Clarence Hinkle and J. M. Hervey, both of Roswell, N. M. (Hiram M. Dow and Curtis Hill, both of Roswell, N. M., on the brief), for appellees.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

Bruce Sullivan[1] was engaged with Henry Wilkinson[2] in operating an oil refinery at Dayton, New Mexico, in the name of Sullivan Refineries, Inc.[3] The Refinery had a working agreement with Maljamar Oil and Gas Corporation[4] whereby the Refinery agreed to refine the Maljamar's oil, under an arrangement whereby the refinery was to deliver to Maljamar 83% and retain as its own 17% of the refined products. The Refinery as principal and Sullivan and Wilkinson as sureties executed a bond in the principal sum of $45,000 to the Maljamar, guaranteeing performance of the agreement. M. E. Baish[5] was vice president of the Maljamar. In the fall of 1925 the Maljamar started the drilling of a wildcat oil well. It had its first showing of oil the following January. Baish told Sullivan and Wilkinson about this discovery and suggested it would be a good chance for them to get some acreage in the vicinity of this well before knowledge of the discovery became generally known. His object in informing Sullivan and Wilkinson was to help them get along in continuing the operation of the refinery, so that Maljamar might have an outlet for the sale of its crude oil. Acting on this information, Sullivan and Wilkinson, in February, 1926, acquired a large block of state oil and gas leases consisting of approximately 30,000 acres. The title to all of these leases was taken in the name of Sullivan. They also acquired eight government oil and gas prospecting permits, each covering approximately 2560 acres, for each of which they paid $500, the original permittees each reserving 7½% royalty. The money used to acquire these prospecting permits was Wilkinson's money. Sullivan and Wilkinson each took one prospecting permit in their respective names. The remaining six were assigned, one to Wilkinson's wife, one to Sullivan's wife, one to Sullivan's mother, one to Sullivan's father, one to Sullivan's sister-in-law, and one to Sullivan's cousin. The permits were so held because one person could not own more than one oil and gas prospecting permit. 30 U.S.C.A. § 221. The permits assigned to the relatives of Sullivan and Wilkinson were gifts, no consideration being paid for them, and Sullivan took back from each of them assignments and selling rights. He had complete control of the permits, with power to buy, sell, assign or make contracts, without consulting any of the parties in whose names the permits stood.

In March, 1926, Sullivan sold to Sterling S. Beardsley a 25% interest in all of this acreage for approximately $11,000. Shortly thereafter he also sold to Wilkinson's father-in-law, Charles B. Williams, herein called Williams, a 25% interest in all of the acreage, for approximately $11,000. Baish was given a ten per cent interest in the acreage for the information furnished concerning the well drilled by Maljamar. This syndicated acreage was managed, controlled and operated by Sullivan as trustee until about August, 1926.

Williams, who had loaned Sullivan and Wilkinson approximately $10,000 in addition to the $11,000 which he had invested in the 25% interest in the leases, became disturbed as to the security of his investment, so Sullivan and Wilkinson assigned their remaining interest in the leases to him as security for the $10,000 which had been borrowed, and for the $11,000 invested in the syndicate. It was agreed that when Williams had recovered his entire investment of $21,000 the 65% interest should be retained until the claim of the Maljamar had been fully paid, at which time the entire interest should be reassigned to Sullivan and Wilkinson.

---

[1] Herein referred to as Sullivan.
[2] Herein referred to as Wilkinson.
[3] Herein referred to as the Refinery.
[4] Herein referred to as the Maljamar.
[5] Herein referred to as Baish.

The Refinery was heavily involved at this time, and its financial condition became precarious. It owed Maljamar and the Twin Lakes Oil Company, an affiliate, approximately $26,000; it was indebted to Williams for $21,000; it owed R. A. Shugart, an employee, $2,700. The Refinery was closed in August, 1926. In December, 1926, Maljamar brought suit against the Refinery for its indebtedness and for the appointment of a receiver. There was general dissatisfaction with Sullivan's management of the property; Williams became alarmed and wanted his money; Twin Lakes was afraid it would not get its money; Maljamar was concerned about getting its money and about the way the acreage was being handled.

Finally a meeting of the interested parties was held and it was decided to appoint Shugart trustee to handle and manage the property. Shugart had been an employee of the Refinery from March 16, 1926, to July 21, 1926.

Shugart agreed to act as trustee, providing they would have a trust agreement drawn by a competent attorney, outlining his powers and giving him full authority to make assignments, transfers and sales. Such a trust agreement was drawn up on September 14, 1926, and executed by Williams, Baish and Sterling S. Beardsley as parties of the first part, and Shugart as trustee. All the acreage was thereupon assigned by Williams to Shugart and Shugart acted as trustee under this arrangement until March 11, 1928.

But the affairs of the trust did not improve. Williams continued to be very much concerned about his investment. On March 11, 1928, Williams, Wilkinson and Baish came to Artesia, New Mexico, for a conference with Shugart. The day was spent discussing affairs of the trust. They discussed buying, giving, taking, trading, or arriving at a figure where one or the other side would buy out the other. Williams said he wanted to get his money out— that was all he wanted. As a result of this conference, an agreement was effected whereby 'Shugart and Baish agreed to buy the interest in the trust property held by Williams.

The consideration for the purchase was as follows: They were to pay Williams approximately $8,000, the balance that would be due on the amount of money invested by him in this trust after he had received his distributive share of funds on hand or in the process of collection from sales made by the trustee; they were to procure a release of the claims of the Maljamar and Twin Lakes and a surrender and cancellation of the $45,000 surety bond upon which Sullivan and Wilkinson were personally liable; Shugart was also to release any claim he had against Sullivan and the Refinery. In consideration of this, Williams agreed to sell and assign to Shugart and Baish the 65% interest in the trust property which he held, and also procure a quit claim deed from Sullivan and Wilkinson to himself.

A few days later Williams and Wilkinson discussed the meeting of March 11 with Sullivan and explained the deal that had been made and asked him to approve it. Wilkinson told him that he thought it was the thing to do. Sullivan demurred, but said he would sign the deed to save a friend.

March 17, 1928, Shugart wrote Williams a letter, enclosing a quit claim deed to be signed by Sullivan and Wilkinson and their wives, quit-claiming all their rights in the trust property to Williams; an assignment for Williams and his wife to Shugart for the 65% interest; the released bond given by the Refinery to Maljamar in the sum of $45,000, signed as sureties by Sullivan and Wilkinson; and a relinquishment of rights due the Maljamar on the bond, and for any money due it from Sullivan and Wilkinson, with instructions that these papers be held by Williams until Shugart had collected the moneys in process of collection from sale of interests in the trust estate. April 5, 1928, Shugart wrote Williams enclosing the amount of money due him from the distribution, also his note for $4,000, and the note of Baish for $4,000; also two checks for $21.34 each. Wilkinson and his wife executed the quit claim deed to Williams a few days after the Artesia meeting. Sullivan and his wife did not execute the deed until August 27, 1928. After the meeting and the execution of the agreement on March 11, 1928, Shugart made no further reports to anyone as trustee. From that date on, he treated the property as belonging to him and Baish.

On July 13, 1926, Sullivan had sold an undivided one-half interest in the permits referred to as the Fern Sullivan and N. I. Sullivan permits to the Humble Oil & Refining Company. In 1930 the Humble Oil and Refining Company, desiring to divest

itself of its interest in these permits, directed its attorney to carry out the transfer. Assignments were executed by Palmer Bradley, who held the title to these permits for the Humble Oil and Refining Company, reassigning this half interest to Fern Sullivan and N. I. Sullivan. These reassignments were not delivered. Shugart exhibited to the attorney for the Humble Oil and Refining Company the trust agreement, the quit claim deed from Sullivan and wife and Wilkinson and wife to Williams, and the assignment from Williams to Shugart, as evidence of his title to this undivided half interest in these two permits, whereupon new assignments were made, assigning this interest to Shugart.

August 14, 1939, plaintiffs filed their amended bill of complaint against Shugart, Baish, Rena Shugart and Neil B. Watson in the District Court of the United States for the District of New Mexico, seeking to hold Shugart accountable as trustee of these oil and gas leases and the oil and gas operating permits, alleging that they as beneficiaries of the trust estate were the owners of the same and charging that he had received money and property belonging to the trust for which he had never accounted, and asking for an accounting and for a division of the alleged trust assets among plaintiffs. As to the remaining defendants, the complaint alleged that they claimed some interest in the trust res adverse to that of plaintiffs.

Defendants Shugart and Baish filed their answer denying that there was a trust agreement with plaintiff or any of them, or that any of the plaintiffs had any right, title or interest to any of the properties referred to in the amended complaint or that they were entitled to an accounting. As a further defense the answer asserted the contract of March 11, 1928, by which Shugart and Baish, for a valuable consideration, purchased the property in controversy and that from that date none of the plaintiffs had ever made any demand or claim upon the defendants for any interest in the property and that any right they might have was barred by the Statute of Limitations. As a third defense, the answer asserted that none of the plaintiffs made a demand upon the defendants or asserted any rights to these properties; that the properties were of a doubtful value and of a speculative nature; that the plaintiffs had been guilty of laches and that it would be inequitable and unjust to grant their prayer for an accounting, and that they were estopped to assert any pretended claims. Defendants prayed that their title to the properties be quieted. Defendants Rena Shugart and Neil B. Watson filed their separate answers. The issues determinative of the question involved are raised in the answers of Shugart and Baish.

The trial court made extensive and detailed findings of fact and conclusions of law. The findings of the court around which the controversy centers are: That Sullivan and Wilkinson acquired, in equal proportion, all of the beneficial interest in and to the oil and gas prospecting permits; that for convenience in handling said oil and gas prospecting permits, assignments of various permits were made to each of the remaining plaintiffs; that no consideration was paid by the assignee in whose name they stood, except by Sullivan and Wilkinson; that the defendant Shugart acted as trustee from September 14, 1926 until March 11, 1928; that the contract of March 11, 1928, under which Shugart and Baish purchased the 65% interest referred to in the trust agreement as being owned by Williams, was to take effect and did take effect immediately and as of March 11, 1928; that at the time of the execution of the contract, a full and complete accounting and a full and complete disclosure was made by the trustee, Shugart, of everything pertaining to the trust, to Baish, Beardsley, Williams, Wilkinson and the Maljamar; that immediately thereafter Sullivan obtained and had full knowledge of all the terms and conditions of sale and the facts relative to the condition of the trust; that there was no fraud practiced by Shugart and Baish in purchasing the 65% interest; that no material misrepresentations were made to Williams, Wilkinson or Sullivan; that no material facts were concealed from them, that they were in a position to know and could have ascertained readily to their own satisfaction the value of the properties and that Sullivan executed and delivered the deed at the request of Wilkinson; that from and after March 11, 1928, none of the plaintiffs ever made a demand upon any of the defendants or made known to them any purported claim to the properties; that the defendants had no knowledge or information concerning any purported claim of the plaintiffs or any of them for more than 11 years until the filing of this suit on or about May 8, 1939.

The court concluded as a matter of law that the contract of March 11, 1928, was a valid and binding contract effective as of March 11, 1928; that by virtue thereof the 65% interest in the property in controversy became vested in the defendants as of that date; and that the plaintiffs thereafter had no beneficial interest therein or thereto; that it dissolved the trust, and thereafter no further trust relationship existed between the defendant Shugart and the plaintiffs or any of them. Upon the same day the court entered its judgment in favor of defendants and against plaintiffs, dismissed the complaint and entered judgment for defendants for costs. Further judgment was entered quieting the title of Ralph A. Shugart and M. E. Baish to all the properties involved, against the plaintiffs and each of them and all those claiming by, through or under them. From this judgment an appeal has been taken to this court.

It is urged: First, that Shugart as trustee did not affirmatively show that the transaction between him and Bruce Sullivan was entirely fair and advantageous to the beneficiaries; that the trustee concealed material facts and took an unconscionable advantage; Second, that the trustee did not affirmatively show that the transaction whereby he obtained from the Humble Oil and Refining Company the so-called Palmer Bradley half interest in the Fern Sullivan and N. I. Sullivan permits was advantageous to the beneficiaries; that in this transaction he unfairly acquired the property belonging to the beneficiaries; Third, that the six permittees, other than Sullivan and Wilkinson, were the owners of the prospecting permits standing in their names; and, Fourth, that the defendant Watson should not have been dismissed from the complaint.

■ Plaintiffs' theory is that the contract of March 11, 1928, whereby Shugart and Baish purchased the assets, did not become final until the execution of the quit claim deed by Sullivan on August 27, 1928, and that therefore the trust continued until that date. Williams testified that when he left the meeting on March 11 he considered a definite deal had been made as of that date and that he would have carried out the agreement regardless of what happened after that. Baish and Shugart likewise testified that they considered the deal closed when the agreement was made March 11. True, it was necessary to carry out the details, such as collecting the balance of the money which was due Williams, making the notes and procuring the quit claim deed from Sullivan and Williams. These were details in the completion of the sale which had been made March 11. March 17, 1928, Shugart wrote Williams enclosing the quit claim deed to be signed, an assignment for Williams and his wife to execute to Shugart, the $45,000 bond given to the Refinery, a release of Shugart's claim against the Refinery, a release of Shugart's claim against Sullivan, a release of the claim of Maljamar against Sullivan and Wilkinson. The letter stated that these papers were to be held until Shugart had collected in the balance of the money due the trust, then in the process of collection. By April 5, 1928, Shugart had made collection of the moneys and knew the balance due Williams. On that date he wrote Williams enclosing the amount of money due Williams from the collections, his note to Williams for $4,000, Baish's note to Williams for $4,000, also his check and Baish's separate check, each for $21.34, the balance due Williams above the two $4,000 notes. In this letter he stated that Sullivan had promised that he would stop in Hereford, Texas, on his way back to New York and execute the quit claim deed. The court found that the contract of purchase was to take effect and did take effect immediately, as of March 11, 1928, and that the trust terminated at that time. The finding of the court is right.

It is necessary, therefore, only that we scrutinize the transaction of March 11, 1928, to ascertain if Shugart discharged that high degree of responsibility which the law places upon a trustee, where he himself deals with the beneficiaries of the trust.

■ While transactions between a trustee and the cestui que trust are not prohibited, such transactions will be most severely scrutinized. A trustee may not profit by any transaction he may have in relation to the trust estate at the expense of the beneficiaries. In all his dealings with the trust estate he is held to the highest degree of candor and frankness. He must not only be strictly truthful in all his representations but must not remain silent concerning any matter of which he has knowledge that would throw light upon the trust estate. Courts of equity will set aside a transaction had by a trustee with the beneficiaries on the slightest ground. It would be needless to cite any authorities to sus-

tain this statement. It is the unanimous holding of all courts. It is in this light that the transaction must be viewed.

On March 11, 1928, Sullivan and Wilkinson and their Refinery were broke. The Refinery was closed; suit had been filed against them by Maljamar, to whom they owed $26,000. They owed Williams $21,-000. They owed Shugart $2,700. All of the oil leases in which they held the 40% interest, which was pledged for their debt to Williams, had been placed in a trust. Shugart was the trustee. He consented to act as trustee at their request. He had been managing this property. There was but little sale for wildcat acreage. They were unable to meet their bills. Williams was demanding settlement of his claims.

■ Shugart did not initiate any proceedings to buy the trust estate. The meeting of March 11 was arranged at the request and solicitation of Williams. Williams, Wilkinson and Baish, all interested in the trust estate, came for a conference with Shugart. It is conceded that at that meeting Shugart made a full and complete disclosure of the condition of the estate and its possibilities. Williams stated that he wanted his money. Shugart and Baish said they would be willing to sell their interests, but Williams would not purchase. The transaction was finally worked out and agreed to by all the parties, including Wilkinson, the associate of Sullivan. Within a few days Wilkinson and Williams had a conference with Sullivan, in which a complete and full disclosure was made to him of the transaction of March 11. He thought it was a poor deal, but had no suggestions as to how the situation could be met. Wilkinson recommended the deal. He was at that time president of two banks and was financially responsible. Apparently Sullivan was not. Wilkinson was threatened with suits which would result in big judgments against him personally and would be ruinous to him. The acreage was of very doubtful value. This is evidenced by the fact that in August, 1937, Sullivan wrote Shugart, who was then trustee, asking him to come to Albuquerque to see him and a man named Lange, who was interested in this acreage. In the letter Sullivan stated that he thought he could sell the entire acreage for $1.75 an acre. Had this sale been made, it would not have produced sufficient revenue to pay the outstanding claims against the trust estate. There is a complete absence of even a sus-

picion of unfair dealing in this transaction by the trustee, Shugart.

■ There is yet another reason why appellants cannot prevail. They are faced with the insurmountable barrier of laches. More than 11 years intervened between the execution of the contract of March 11 and the institution of this suit. During all that time no claim was made upon Shugart or Baish; no inquiry was made by Sullivan or anyone else. Shugart and Baish proceeded during this period of time with their effort to work out this property. In 1928 they made a deal with a drilling concern, looking to the development of this property. This deal fell through. In 1932 they made a deal with a man named Hammel for development. Nothing came of this transaction and they had to institute litigation to terminate the contract. After March 11, 1928, they made efforts with eight or ten different people to get these properties developed. In 1937 they formed a syndicate through which they raised $20,000, Shugart and Baish each contributing $5,-000, and executed a contract with one Van Welch to drill a well on the acreage. This well resulted in a small producer, of approximately 50 to 75 barrels, and is now pumping. The well is not completely paid for. Shugart and Baish are now security for $3,500 on the pumping equipment.

The only excuse offered for this inordinate delay is a statement by Sullivan at the trial that he first obtained knowledge of the true facts within the past four months. From 1928 to 1937 Shugart at various times sold interests in this property by deeds of conveyance which were filed for record. Williams had a full and complete knowledge of the agreement with Maljamar, so also had Wilkinson, Sullivan's partner. Many avenues were open to Sullivan to gain the information which he says was concealed and unknown to him until four months before the institution of this action. All of the transactions were in the open. No attempt was made to conceal anything.

■ Mere ignorance of the facts will not excuse delay. One must be diligent and make such inquiry and investigation as the circumstances reasonably suggest and means of knowledge are equivalent to actual knowledge. 21 C.J. § 244, p. 247; Baker v. Cumming, 169 U.S. 189, 18 S.Ct. 367, 42 L.Ed. 711; Wells, etc., Co. Express v. Walker, 9 N.M. 456, 54 P. 875.

■ The duty to act with dispatch is especially imperative where one claims an

interest in property that is highly speculative. One may not withhold his claim to a highly speculative venture, such as was involved in these wildcat oil and gas leases and permits, to await the outcome of an effort to develop them put forth by another, and then when his efforts are crowned with apparent success, come in and claim the fruits thereof. Such a course does not commend itself to a court of equity. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328; Patterson v. Hewitt, 195 U.S. 309, 25 S.Ct. 35, 49 L.Ed. 214; Gildersleeve v. N. M. Mining Co., 161 U.S. 573, 16 S.Ct. 663, 40 L.Ed. 812; James v. Anderson, 39 N.M. 535, 51 P.2d 601; 21 C.J., § 220, p. 225.

■ Laches does not concern itself with the mere lapse of time, but with the inequity of permitting a claim to be enforced. Taylor v. Salt Creek Consolidated Oil Co., 8 Cir., 285 F. 532; Minnesota Mut. Inv. Co. v. McGirr, 8 Cir., 263 F. 847; Standard Oil Co. of Colo. v. Standard Oil Co., 10 Cir., 72 F.2d 524; City of Roswell v. Mountain States Telephone & Telegraph Co., 10 Cir., 78 F.2d 379; Window Glass Mach. Co. v. Pittsburgh Plate Glass Co., D.C., 46 F.2d 484. In the light of this record, it would be most inequitable to permit Sullivan to assert a claim at this late date.

The appellants, plaintiffs below, other than Sullivan, are the persons in whose names the operating oil and gas permits were placed that could not be taken in the names of Sullivan and Wilkinson. The court found that Sullivan and Wilkinson acquired in equal proportion all the beneficial interest in and to the oil and gas prospecting permits described in the amended complaint; that for convenience in handling the permits, other than the ones standing in the names of Sullivan and Wilkinson, were taken in the names of the remaining plaintiffs, that they paid no consideration therefor.

■ This finding is based upon substantial testimony and is approved. But even if it is conceded that these remaining plaintiffs had some interest in these permits, they are as effectively barred by their laches as is Sullivan.

The conclusion reached on the main issue raised by the first assignment of error makes unnecessary a detailed consideration of the question presented in assignments of error Number Two and Number Four.

The decision of the trial court is affirmed.