[No. 709. September 2, 1898.]

## WELLS, FARGO & COMPANY'S EXPRESS, Appellee, v. WILLIAM A. WALKER, Appellant.

### SYLLABUS BY THE COURT.

REFERENCE—FINDINGS—WAIVER OF OBJECTIONS—PRINCIPAL AND SURETY —NOTICE—CORPORATION'S AGENTS—PLEDGES—LIEN.—1. Where, on motion of complainant, an order of reference to a master is made to take proofs and report the same with his opinion, but instead the master reports his findings of fact and conclusions of law, it will be presumed, nothing to the contrary appearing in the record, that the court below acted upon the report as made and complainant's failure to specifically object in the court below is a waiver of his right to object here.

2. A finding of fact by a master is equivalent to the special verdict of a jury, and can not be disturbed unless the evidence is manifestly insufficient to support it.

3. Where there is not any evidence to support the findings of the master, the court below properly sets them aside.

4. Where one becomes surety for an alleged existing shortage in the accounts of another, the mere fact that he has knowledge of an unexplained irregularity (and the fact of the acceptance of the security by the creditor, under the peculiar circumstances of this case is such knowledge to the surety) is sufficient to put the surety upon inquiry; and if he fails to seek important information within his reach he can not, in the absence of fraud on the part of the creditor, set up as a defense facts then first learned which he ought to have known and considered before entering into the contract.

5. Ordinarily a corporation is chargeable with any facts which are known to its agents, but in transactions of a dishonest character between co-employees, where one participates in the perpetration of a fraud upon the corporation for the benefit of the other, the law does not infer that the agent will communicate the facts to the corporation, and under such circumstances the corporation is not bound.

6. A pledgee of building and loan association stock is entitled to a lien thereon, as expenses, for payments made by him of assessments thereof, where it is admitted that the levy is legal and that there would be an infliction of fines against the stock for nonpayment of the assessments, if the pledgor fails or refuses to pay the same.

*Appeal*, from a decree for complainant, from the Second Judicial District Court, Bernalillo County. Affirmed, overruling the former decision of this court in this cause.

The facts are stated in the opinion of the court.

F. W. CLANCY and NEILL B. FIELD for appellant.

C. N. STERRY for appellee.

CRUMPACKER, J.—It is necessary to an understanding of this cause to present a rather voluminous statement of the facts.

The appellee, a corporation (in this statement hereafter called the express company) filed its bill in the court below to foreclose a lien upon a certificate of twenty shares of stock in the Co-operative Building & Loan Association of Albuquerque, New Mexico. The certificate for which was issued by such association to the appellant, W. A. Walker, and by him indorsed and delivered to the express company on the nineteenth day of December, 1893, was to secure the payment of a note dated December 20, 1893 (actually executed December 19, 1893), executed jointly and severally by E. L. Gilbert and W. A. Walker to Charles H. Young as agent for the express company for $1,301.20, payable thirty days after date, without grace. The defendant Walker, having served, answered in substance that he was surety for Gilbert on said note, and alleged that the note was executed and the stock pledged to secure an indebtedness from Gilbert to the express company for the money embezzled by him as agent of the express company and that he was induced to sign this note and pledged this stock through the fraud of the express company in concealing certain facts from him at the time of the

execution of these papers which were well known to the express company. After the issues were joined in this cause the case was referred to the standing master in chancery. The master reported all the evidence heard before him together with his findings of fact and conclusions of law to the court. Upon giving in of the report the express company filed its exceptions to certain of the findings of the master. Upon the hearing of these exceptions the court set the report aside and entered a certain order. After this order was made the express company filed a motion for rehearing and upon this rehearing the court below modified the former conclusion and entered a decree for the complainant. From the evidence reported by the master the following facts fully and clearly appear. The defendant E. L. Gilbert worked for the company at Albuquerque as its agent in charge of its office for eight years prior to December 15, 1893, and established with the company and its officers and in the community where he lived a good reputation for honesty and integrity and ability in his line of employment. On and previous to December 14, 1893, a Mr. Hatch who had been route agent for the company with headquarters at Albuquerque was transferred to San Francisco, and arrangements made to promote E. L. Gilbert from agent at Albuquerque to route agent in place of Hatch. On the fourteenth day of December, 1893, the Times, a newspaper published in Albuquerque printed an article under the heading of "Deserved Promotion," which stated that E. L. Gilbert had that day become route agent of Wells, Fargo & Company with headquarters at Albuquerque, in place of Mr. Hatch, and complimentary notice in connection therewith. On December 15, 1893, the Daily Citizen, published a somewhat similar article. There appears absolutely no connection of the express company with the publication of either of these articles. Mr. Gilbert was checked out December 14, 1893, by Mr. Hatch, who found that Mr. Gilbert's accounts were all right. On December 15, Mr. C. H. Young, connected with the express company as district superintendent and agent there at that time, discovered that Mr. Gilbert had received appar-

ently from the Atlantic & Pacific Railroad Company, $1,201.20 upon two vouchers which he had signed for Wells, Fargo & Company, being the vouchers for July and August, 1893, and that this money was unaccounted for by Gilbert. Immediately upon this discovery he called upon Mr. Gilbert for an explanation, and Gilbert stated to him that there was no doubt that he had signed these vouchers and had received the money upon them; but that there must be a mistake somewhere about it, which if given time he could explain. Mr. Young had known Mr. Gilbert for some eleven years and had known him to be a reputable, industrious and honest man, who had given complete satisfaction as agent for the eight years that he was agent at Albuquerque, both as to his ability and as to his honesty and integrity; and believing and hoping that Mr. Gilbert would be able to make some explanation that would be satisfactory to the company he gave Mr. Gilbert that opportunity, indefinitely suspending him from his position, and connection with the company pending this investigation. Mr. Young stated that he had no knowledge of any facts that created any idea of moral turpitude in this direction beyond the fact that Gilbert had signed these vouchers and had received this money and concerning which Gilbert earnestly claimed that there was some mistake which he would be able to explain if given an opportunity. Mr. W. A. Walker, the appellant, had known Mr. Gilbert for some eight years and had known that his reputation for honesty and integrity in this community was good. Mr. Gilbert had been very kind to Mr. Walker at one time during an illness, and Mr. Walker was a special friend of his. Mr. Walker read the newspaper articles and believed them to be true. The first publication was on Thursday, the fourteenth, and the other on Friday, the fifteenth. On the afternoon of Sunday, the seventeenth, Mr. Walker received a note from Mrs. Gilbert asking him to come to the Gilbert house. Upon that Mr. Walker and his wife went over to call upon Gilbert and found that they appeared to be in a great deal of trouble, and in talking it over he told Walker in substance his trouble. Gilbert and Walker there-

upon from that time to the evening of December 19 tried to borrow money enough to make this shortage good from different persons on a note that was to be executed by Gilbert as principal and Walker and another as security. They saw quite a number of people together and Mr. Walker saw several himself in trying to borrow money for Gilbert. Mr. Walker at this time had the certificate of stock in the loan association, but it was in the hands of a third party who was holding it as security for a loan of $100. About five o'clock on Tuesday evening, December 19, Gilbert went to Walker and told him that if he was willing to let this stock go as his security for three or four days it would be all right. Mr. Walker consented to this upon an agreement that the express company should advance money enough to pay the $100 for which the stock was then held. They then went directly to the office of the express company in this city and the note described in the bill was written out and signed and the transfer of the stock made, the express company advancing the necessary funds to redeem the stock. This was the first time that any of the parties connected with the express company had any knowledge of the fact that Walker was becoming security or proposing to become security for this indebtedness; and they only knew it as he signed the note and arranged with them to advance the money to take up the stock. While the note is dated the twentieth its execution was effected on Tuesday evening, the nineteenth. Walker knew that Gilbert admitted signing vouchers for the cashier of the railroad company aggregating the amount of this shortage, he knew that Gilbert admitted that he had signed these vouchers and that he was legally responsible; he knew that Gilbert claimed that there was some mistake about it which he could explain, if given an opportunity, but that if the express company did not propose to retain him in its employ he would not make the shortage good if it really existed. He believed that if no explanation could be made Gilbert would go to the penitentiary. The express company knew that Gilbert had been indefinitely suspended, pending an investigation, and Walker knew from

Gilbert's statement that unless he made this money good and explained things satisfactorily he would not get his promotion. The cashier of the express company at Albuquerque had during a year prior to this time assisting Gilbert in hiding Gilbert's defalcation of nearly $2,000, distinct from this particular transaction which was not detected until after Walker became surety for Gilbert.

This cause once decided by this court, and reported (50 Pac. Rep. 353; Justice Bantz, dissenting, p. 293) is again presented on rehearing for our determination.

The bill of complainant, answer, order of reference and stipulation are set out in toto, at pages 353-7 of the former majority opinion of this court and are here referred to for enlightenment upon the issue.

The master took proofs and reported his findings of facts and conclusions of law in favor of the defendant, Walker, and recommended that the plaintiff's bill of complaint be dismissed, to all of which plaintiff filed some twenty-six exceptions, and on final hearing, the court below sustained the exceptions, and found for the complainant, and ordered that "the said certificate of stock be sold" in default of the payment of the sum found due from defendant Walker. It is from this decree that the cause is here on appeal.

The questions to be determined are presented by the following assignment of errors by appellant.

1. That the court erred in sustaining the exceptions of appellee to the report of the special master in the cause.

2. The court erred in rendering a decree in favor of the complainant in the court below.

3. The court erred in decreeing to the complainant a lien for the entire amount of the note sued on, with interest.

4. The court erred in decreeing to the complainant a lien to secure the payments voluntarily made by the complainant to the building and loan association.

5. The court erred in refusing to enter a decree in accordance with the report and recommendation of the special master.

We will first give our attention to the power of the chancellor to set aside the findings of the master in this cause.

It is certainly true, as contended by appellee, that the order of reference in this cause to the master to take the proofs merely directed him "to report the same with REFERENCE: bind- his opinion thereon," and made the duties of ings: waiver of objections. the master purely advisory; yet, nevertheless we are constrained to hold that where, as in this case, the order was made on appellee's motion, and the master actually reported the proofs together with his findings of fact and conclusions of law, that the objection is waived by appellee's failure to object in the court below on this specific ground that the report of the master exceeded the scope of the reference, and nothing appearing in the record to the contrary court will presume that the court below acted upon the report as so made by the master. Therefore, this cause stands as if it were originally referred to the master by the assent of the appellee to take the proofs and report his findings of fact and conclusions of law, and that it is well settled by numerous decisions of this and of the supreme court of the United States, that a finding of fact made by a master is equivalent to the special verdict of a jury, and can not be disturbed, unless the evidence is manifestly insufficient to support it. (Givens v. Veeder, 50 Pac. Rep. 315.)

The second question therefore is, whether or not the evidence is sufficient to support the findings of the master?

A painstaking review of all the testimony is convincing that this court in its former majority opinion overlooked controlling facts and reached conclusions not war- PRINCIPAL and ranted by the evidence. To the contrary of surety: notice: corporation's statement there made, it is beyond cavil clear agents. that the officers and agents of appellee were in possession of no facts with respect to Gilbert's defalcation of which appellant was not also actually aware or constructively deemed to have knowledge up to the time that he became surety from sources other that the agents of appellee; all he knew, he knew from representations made by Gilbert himself

and the public press; what he knew was that appellee alleged a shortage in Gilbert's accounts, that Gilbert himself admitted the existence of the shortage and that no matter how it occurred Gilbert was legally responsible for it; that Gilbert was in a "great deal of trouble" "and he believed him liable to a criminal prosecution and conviction; that the public press of the morning of the fourteenth and afternoon of the fifteenth of December, 1893, represented Gilbert as having been promoted, and as being a man of strict integrity; that Gilbert himself represented that if he could make the shortage good "he could still go on with his promotion," "that the company wanted him to make it good but that if they were going to turn him out he wouldn't 'make it good." Whether or not these newspaper articles were given out by authority of appellee, as to which there is no evidence, is immaterial; because at the time of their publication, so far as we can ascertain from this record they were the truth as to Gilbert's promotion and believed by the parties to be true as to his honesty. Gilbert had falsely represented to both appellee and appellant that he had never received this money to his own use, and both parties appeared to have acted upon his statement as truthful; appellee indefinitely suspending Gilbert and forbearing to accuse him pending an investigation, and appellant performing the office of friendship by coming to Gilbert's rescue with temporary financial aid, having every confidence that Gilbert would satisfactorily explain the deficit. Thus Gilbert's affairs stood up to the time of the execution of the note. These facts seem incontrovertibly established. The only difference discernible between the several statements of Gilbert was that to the appellee he admitted having received the money upon the vouchers for the use of the appellee and stated that there must be some error; while to the appellant he denied having received the money on said vouchers to his credit as agent of appellee or at all, and stated that there must be some mistake. It is contended that appellee on this statement of facts was bound to know of Gilbert's moral turpitude and therefore to correct the impression of the public and appellant by the

newspapers, as to his honesty, and that appellee's agents sitting silently by while appellant executed the note as surety was such a concealment of facts as to perpetrate a fraud upon appellant. We can not concede the correctness of these conclusions. We know of no rule of law which enables us to say under the circumstances of this case that appellant's faith in Gilbert's statement was any greater or entitled to more consideration than the faith of appellee in them. True there was a falsehood, but appellee could only detect it by a scrutiny of the accounts for a period of half a year or more, while appellant by asking one question of appellee's agent or of the cashier of the railroad company (of neither of whom he admits having made or attempted to make any inquiry whatever) as to whether or not these vouchers had been paid, would have disclosed a deliberate lie by Gilbert, and at once exposed his criminality. We take it as established in this case that both appellee and appellant at the time of the execution of the note considered the status of Gilbert to be simply negligent, and the note was given to secure the debt, if upon investigation it were proved to exist. The appellant certainly knew from statements made to him by Gilbert that the affairs of Gilbert as published in the newspapers had undergone a material change, and as to his disadvantage, some days prior to the signing of the note; and in the absence of any other evidence affecting the appellee that Gilbert was to be retained in its employ, there being no proof of fraudulent intent in fact, no case is here made out which could release the appellant from his obligation as surety. Appellant's knowledge that there was an irregularity in Gilbert's account with appellee was sufficient to put him upon inquiry, and as said by the learned justice in his dissenting opinion, "In McGee v. Insurance Company, 92 U. S. 98, the court say (while fully recognizing that the slightest fraud by the creditor will relieve the surety), 'But there is a duty incumbent upon him (the surety); he must not rest supine, close his eyes and fail to seek important information within his reach. If he does this and loss occurs he can not, in the absence of fraud on the part of the creditor, set

up as a defense facts then first learned, which he ought to have known and considered before entering into the contract.' 'In such circumstances the creditor is under no obligation legal or moral to search for the surety and to warn him of the danger of the step he is about to take.   No case has gone so far as to require this to be done."   Ham v. Grove, 34 Ind. 18.

Upon the testimony of Burt, the cashier of appellee during the year or so preceding this discovery of Gilbert's shortage, it is sought to predicate the knowledge by appellee of Gilbert's dishonesty "for more than one year prior to December 20, 1893."

It is admitted that Gilbert was guilty of speculations entirely distinct from the one here involved for a period of nearly a year prior to the detection of this shortage, and therefore unless it is established either that appellee failed to use ordinary care to discover such frauds or that the knowledge of the cashier, Burt, is imputable to appellee, we must decide that the court below committed no error in setting aside the findings.   All the testimony as to lack of ordinary care in the inspection of the accounts is embraced in the following question and answer:   "State Mr. Burt whether or not at any time during the existence of this defalcation and prior to December 14, 1893, if any representative of Wells, Fargo & Company had appeared in that office and counted the cash, when you were not expecting to have it counted, and you had no notice that it was to be counted, he would have inevitably discovered the existence of this defalcation?   A.   Yes, sir; he would."   There is nothing in the testimony to show that Burt was not always expecting to have it counted, or that he ever had notice of the appellee's intention to examine his accounts.   On the contrary, the appellant by his own witness established the fact that the appellee had a route agent whose duties were to audit these accounts, and that the accounts in this particular office were audited in August, 1893 (after a defalcation existed), and apparently were correct.   We must hold that the testimony of the witness was a conclusion, incom-

petent as evidence in this case. Appellee's auditor had the right to assume that the cashier was honest and performed his duty, and that if the books agreed with the vouchers and cash turned over that the account was correct. However Burt and Gilbert by their superior cleverness and cunning quite outwitted the auditor, and appellee was unable to learn the true state of affairs. Ordinarily a corporation like any other principal is chargeable with any facts which are known to its agents within the scope of their employment, but these transactions between Burt, the cashier, and Gilbert, the agent, which were of a dishonest character, and in which Burt was a participant in the fraud for the benefit of Gilbert, the law does not infer that the agent will communicate the facts to his principal, the corporation, and under such circumstances the corporation is not bound by his knowledge. (American Surety Company v. Pauly, 170 U. S., p. 150.)

We, therefore, can not discover sufficient evidence to support the material findings upon which the master based his conclusions of law that appellant was released from his liability to appellee as surety of Gilbert.

Finally, the fourth assignment of error remains for consideration.

Has appellee acquired a lien upon the stock pledged for the payments made by it to the building and loan association upon assessments legally levied and to prevent PLEDGES: liens.     the infliction of fines on said stock so held as collateral? We answer this question in the affirmative. The appellee has a special property interest in the share of stock evidenced by the pledge. We think it is well established by the authorities that the pledgee has the right to pay all assessments as are legally levied upon the stock, which the pledgor may fail or refuse to pay, and which would become a lien superior to the pledgee's interest therein, and to deduct such payments as expenses incurred in preserving and protecting the title and making the security available on maturity. Schouler's Bailments, p. 199; Jones on Pledges, sec. 400; 18 Am. and Eng. Ency. of Law, p. 858, and notes;

McCalla v. Clark, 55 Ga. 53; Furness v. Union Nat. Bank, 147 Ill. 571. From the first article of the stipulation entered into by the parties, it is plain that appellant considered himself liable for the assessments referred to therein as paid by appellee, and the third article appellant admits that all assessments referred to therein as paid by appellee were legally levied, and so paid in order to prevent the infliction of fines against the pledged stock, and looked upon in the light of these articles, the fourth article was an admission by appellant that all "Such further payments" (payments of assessments legally levied to prevent infliction of fines) were necessary for the preservation of the stock. And therefore we must hold that the court below had by this stipulation ample evidence before it upon which to decree the appellee a lien to secure the payment so made by it to the building and loan association.

Holding that the court below committed no error in setting aside the findings of the matter, we must overrule the former decision of this court in this case and affirm the judgment of the court below.

Mills, C. J., Leland, McFie and Parker, JJ., concur.