O.L. McLENDON, et al., Plaintiffs,

v.

GEORGIA KAOLIN CO.,
INC., Defendant.

Civ. A. No. 85–338–2–MAC (WDO).

United States District Court,
M.D. Georgia,
Macon Division.

Nov. 12, 1993.

James E. Carter, Madison, GA, for plaintiffs.

John Burke Harris, Jr., William Camp Harris, John Elvis James, Macon, GA, for defendant.

## ORDER

OWENS, Chief Judge.

Before the court is defendant's second motion for summary judgment. Defendant's first motion for summary judgment was granted in part and denied in part. *See McLendon v. Georgia Kaolin Co., Inc.*, 782 F.Supp. 1548 (M.D.Ga.1992). The case grew out of numerous conveyances of interests in a tract of land in Wilkinson County, Georgia, from plaintiffs, some of the heirs of Edward D. Smith, to defendant, Georgia Kaolin Company, Inc., which took place in 1969.

The issues in the case were narrowed by the first motion for summary judgment. A claim of fraudulent concealment remains. Plaintiffs allege that defendant purchased their interests in the 325 acres by fraudulently concealing the fact that the property contained a significant kaolin deposit.

Defendant has filed a second motion seeking summary judgment on the claim of fraud and contending that plaintiffs' claims are barred by the statute of limitations. Both of these matters were addressed in the previous motion for summary judgment; however, defendant claims that subsequent depositions have exposed the paucity of facts with which plaintiffs intend to prove their case.

## I. FACTS

The facts were fully discussed when the court addressed the first motion for summary judgment. However, having found parts of plaintiffs' affidavits to be false, the court will summarize the facts now before the court.

### A. The 1969 Conveyances

In the mid 1960's, Tommy Smith and Juanita McLendon proposed selling the Smith farm to the other Smith heirs.[1] The heirs agreed to sell, and Tommy Smith, as the only heir who lived on the property,[2] was made implicitly responsible for negotiating the sale. Most of the other heirs had moved out of Georgia. Plaintiffs' depositions.

In August of 1965, Tommy Smith hired an attorney, Fred M. Hasty, to represent the Smith heirs in the sale. (Stipulation of March 16, 1990.) Hasty contacted A.G. Bowman, head of the land department at defendant Georgia Kaolin Company, Inc. ("GKC"), on September 21, 1965, to see if defendant was interested in purchasing the property. *Id.*

Defendant already had a lease interest in the mineral rights of the Smith property through its subsidiary Georgia Kaolin Company ("GKC2"). Tommy Smith executed this lease to GKC2 on May 10, 1948. Plaintiffs' Exhibit E.[3] The lease named Tommy Smith as lessor, but gave no indication that there were other owners of the property or that Tommy Smith held only a partial interest in the property.[4] GKC2 did not check the title

---

1. The term "Smith heirs" refers to the heirs of Edward D. Smith who both held an interest in the Smith property in the mid 1960's and sold that interest in 1969. The term excludes Grant Smith, Sidney J. Smith, Jr., and Evie Barksdale Solomon.

2. Tommy Smith, known and referred to as Uncle Tommy by most of the plaintiffs, lived on the property and farmed it as his own.

3. The lease was to be effective for twenty-five years, unless terminated by GKC2, and GKC2 had the option to extend the lease for an additional twenty-five years. The lease gave GKC2 the right to "drill, prospect for, mine and remove all the kaolin" and other minerals found on the property in exchange for an initial consideration

of $162.50, a yearly payment of $325, and royalty payments when mined. Plaintiffs' Exhibit E.

4. The court notes that apparently when Tommy Smith executed the 1948 lease, he thought that he had the authority to sign for some of the other Smith heirs. Tommy Smith's mother and five of his siblings executed a limited power of attorney to Tommy Smith on November 25, 1939. Plaintiffs' Exhibit I. This instrument gave Tommy Smith the power to sell timber from the property, to sign rent waivers in order to borrow money to farm the property, and "to do and perform all and every act and acts, thing and things, device and devices, in the law whatsoever needful and necessary to be done in and about the premises." *Id.* However, the instrument did not give Tom-

on the Smith property until several years later.

Under the lease, GKC2 drilled on the Smith property in 1949 and allegedly determined that a valuable kaolin deposit existed, but never removed any kaolin or other minerals from the property.[5] The other Smith heirs were unaware of both the lease and the drilling. *See* Plaintiffs' Depositions. GKC2 and defendant did not learn that the 1948 lease was only valid for a partial interest in the property until sometime after the negotiations with Hasty began in 1965. Stipulation of March 16, 1990. *See also* Plaintiffs' Exhibit B.

Although Hasty's negotiations with defendant for the sale of the Smith property were ultimately unsuccessful,[6] A.G. Bowman and Tommy Smith continued their own negotiations. Plaintiffs' Exhibit B.[7] According to a letter from Bowman to defendant's president dated February 21, 1967, the following terms were reached:

> I have been negotiating with Tommy Smith the possible purchase of [the Smith property] along the following lines. Tommy Smith would be paid $1000 when all of the heirs have signed the Option to Purchase. The other heirs would be paid

$25.00 each as consideration. The option is to be for twelve months and provide a purchase at $85,000 [or $260 per acre]. Tommy Smith wants to have the use of the house and a small acreage of farm land around same for his lifetime or eight years, whichever comes sooner.

> .... It is going to take quite a bit of time and effort by Tommy Smith to get this option signed. That is the reason for the payment of $1000 to him.

> ....

> I plan to make a separate option to purchase for each of the heirs in the name of Alex Boone, Jr. so that, at your election, we can purchase a part interest if we do not get all of the heirs to sign the original Options to Purchase. Plaintiffs' Exhibit B.[8]

Sometime in early 1967, defendant retained Alex S. Boone, Jr. as its attorney to assist in purchasing the Smith property. Alex Boone had previously represented Tommy Smith's wife, Agnes Smith, in some unrelated matters.[9] Plaintiffs Jerry Day and Robert Lee Smith were under the impression that Alex Boone was Tommy Smith's attorney.[10] Except for these two plaintiffs, the

---

my Smith any power to sell or to lease the interests of those who signed it. *Id.*

5. The parties are in dispute as to what GKC2 learned about the kaolin on the property from the 1949 drilling. However, a letter dated February 21, 1967, from A.G. Bowman, head of defendant's land department, to defendant's president states, "There is no doubt in my mind that this property contains a large tonnage of clay similar to [clay already being investigated on an adjacent property]." Plaintiffs' Exhibit B.

6. Stipulation of March 16, 1990. Tommy Smith discharged Hasty's services in the summer of 1966. *Id.*

7. Plaintiffs have alleged that Bowman told Tommy Smith and some of the Smith heirs that the property was not worth very much because GKC2 held a lease on the property which could run for fifty years. However, there is no competent evidence to establish this contention.

8. There *is* further documentary evidence of Tommy Smith's relationship with defendant during the sale of the property:
 1. A June 4, 1968 letter from A.G. Bowman to Alex Boone states, "Please furnish me with

Xerox copies of the Options to Purchase that Tommy Smith has acquired." Plaintiffs' Exhibit F.
 2. A July 29, 1970 memo to defendant's file from A.G. Bowman states, "As the result of [Tommy Smith's help in the purchase of the Smith property], we gave Tommy Smith the right to use the house that he now occupies for his lifetime or for a period of 8 years, whichever ended first."

9. In 1964, Agnes Smith, wife of Tommy Smith, hired Alex S. Boone, Jr. to represent her in connection with her appointment as receiver for an estate which contained property adjacent to the Smith property. Agnes Smith executed a mineral lease on this property on July 9, 1964. The rate under this lease was 15 cents per ton of finished product of kaolin clay. Plaintiffs' Exhibit N.

 In addition, Boone represented Agnes Smith when she was appointed guardian of her niece, Dorothy Ann Cooper in 1961. Affidavit of Dorothy Ann Cooper (Plaintiffs' Exhibit A6).

10. The affidavits purported that all of the plaintiffs were under the delusion that Boone represented them in the sale and, hence, they relied

heirs were not aware that Alex Boone was an attorney and, thus, did not rely upon Boone as their attorney. Plaintiffs' depositions. However, none of the heirs knew that Boone represented a kaolin company. *Id.* Moreover, Tommy Smith never revealed that defendant was paying him to get the options signed.

The option contracts named Alex Boone as the "Purchaser" and failed to mention defendant. Each option provided that the "Purchaser" had one year to exercise the option and that the "Purchaser" had "the right to enter upon the said lands to drill, dig test pits, remove samples and do all other things necessary and incidental to the thorough prospecting of said lands for the purpose of determining the quantity and quality of kaolin and all other minerals in, on or upon said lands." The options clearly stated that they were transferable and assignable by either party. Sixteen of the Smith heirs signed the options between April 22, 1968, and October 21, 1968.[11]

Thereafter, defendant drilled over 100 holes on the Smith property. Plaintiffs' Exhibit D.[12] With the exception of Tommy Smith, the Smith heirs were unaware of this drilling. Plaintiffs' Exhibits A1–A15 (affidavits of plaintiffs).

Defendant did not reveal any information that it obtained from the drill samples to the Smith heirs. *Id.* Moreover, it is defendant's

policy not to reveal such information to prospective purchasers. Although the plaintiffs were aware of the presence of "chalk" on the Smith property, none knew that the property contained a valuable mineral, kaolin. Plaintiffs' depositions. Plaintiffs were unfamiliar with Yara Engineering, defendant's name at the time, and assumed the land was being sold as farm land. *Id.*

On July 28, 1968, Tommy Smith purchased a ⅒ interest in the Smith property from his brother's sister-in-law, Evie Barksdale Solomon, who resided in Michigan. Defendant's Exhibit 50. He purchased this interest for $500 and, consequently, had a ⅙ interest in the Smith property. There is some evidence that Alex Boone handled this transaction for Tommy Smith.[13] After this transaction, the remaining three Smith heirs (except Grant Smith and Sidney J. Smith, Jr.) signed options to Alex Boone.[14]

Prior to the expiration of each option, Alex Boone notified each heir by letter that he wished to exercise the options. The deeds conveyed each heir's interest to Yara Engineering Corporation, which was listed as the purchaser on each deed. Boone's letters did not reveal that he represented defendant. Nor did Tommy Smith reveal this fact to the other Smith heirs.

The Smith heirs signed the deeds between April 24, 1969 and October 21, 1969.[15] When

---

upon Boone to represent their interests. However, the deposition testimony shows this allegation to be false, with the possible exception of Jerry Day and Robert Lee Smith. Robert Lee Smith testified that he thought Boone represented his uncle, but did not think Boone was his own attorney. Jerry Day, on the other hand, testified that he believed Boone represented him as well as his uncle, Tommy Smith.

11. Plaintiffs signed the options as follows:

| | | |
|---|---|---|
| Tommy Day | 4/24/68 | 1/160 |
| Viola S. Griffin | 4/22/68 | 1/60 |
| W.C. Day | 4/24/68 | 1/40 |
| Lula S. Courtney | 5/05/68 | 1/60 |
| Bessie Cornelia Hughes | 5/09/68 | 1/40 |
| Bernice Tift Newton | 5/31/68 | 1/40 |
| Charles A. Smith | 5/31/68 | 1/60 |
| Lillie Bell S. Teal | 5/31/68 | 1/60 |
| Robert L. Smith | 5/31/68 | 1/60 |
| Juanita S. McLendon | 5/31/68 | 1/10 |
| Jerry Day | 10/21/68 | 1/160 |

12. The parties disagree as to what defendant discovered from these drill samples. Apparently, defendant did not believe the drilling would interfere with getting the remainder of the options signed. *See* Plaintiffs' Exhibit P.

13. An unexecuted onion skin copy of the deed conveying Ms. Solomon's interest to Tommy Smith is in Alex Boone's files. Plaintiffs' Exhibit K.

14. 
| | | |
|---|---|---|
| Tommy Smith | 8/29/68 | 2/10 |
| James E. Day | 9/17/68 | 1/160 |
| Jerry Day | 10/21/68 | 1/160 |

15. The deeds were conveyed as follows:

| | |
|---|---|
| Tommy Smith | 4/24/69 |
| Viola S. Griffin | 4/24/69 |
| W.C. Day | 4/24/69 |
| Bernice Tift Newton | 5/5/69 |

they signed the deeds, plaintiffs did not know that defendant's business (then called Yara Engineering Corporation) was mining kaolin, but thought it was an engineering or farming company. Plaintiffs' Depositions. Defendant paid each heir his proportionate share of the $85,000 purchase price. *Id.*

## B. From 1969 Until the Filing of This Lawsuit

After the Smith heirs conveyed their interests in the Smith property to defendant in 1969, Tommy Smith remained on the property as defendant and he had agreed. It is unclear how long Tommy Smith continued to live on the property; however, some of the Smith heirs were aware that he remained on the farm after its sale. In addition, defendant paid Tommy Smith according to their agreement for his assistance in acquiring the options.

Plaintiffs visited the farm with differing degrees of frequency before the sale. Plaintiffs' depositions.[16] Only a few plaintiffs visited either the farm or Wilkinson County since the date of the sale. *Id.*[17]

To date, defendant has not drilled or otherwise removed minerals from the property; defendant holds the land as a reserve kaolin deposit. However, open kaolin mines have been in operation on properties adjacent to the Smith property since the time of the 1969 conveyances.

Plaintiffs state that they only learned of Kaolin on the Smith property in 1983 when they were approached by Robert Watkins. Robert Watkins informed the Smith heirs that they had been "cheated" when they sold their land to defendant. Plaintiffs' depositions.[18] Thereafter, plaintiffs filed suit in 1985. None of the plaintiffs knew that Tommy Smith had been paid by defendant for his help in acquiring the options until this was revealed during discovery in this lawsuit.

## C. Discrepancies Between Deposition Testimony and Affidavits

■ In ruling on a motion for summary judgment, the court must resolve all doubts, draw all inferences, and view all disputed facts in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The above facts have been viewed in that light. However, a party opposing the motion may only rely on competent and admissible evidence to defeat the motion. *E.g., Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir.1980). In particular, an affidavit may only be considered in ruling on summary judgment if it was made based on personal knowledge, sets forth facts admissible in evidence, and shows the affiant to be competent to testify. *CMS Industries, Inc. v. L.P.S. International, Ltd.*, 643 F.2d 289 (5th Cir. 1981).

In the court's earlier order concerning defendant's motion for summary judgment, the court accepted as true certain facts presented by plaintiffs in affidavits. The plaintiffs' affidavits are virtually identical, apparently having been concocted by counsel from form paragraphs. *See* Plaintiffs' Exhibits A1–A15.[19] Subsequent depositions have proven

| | |
|---|---|
| Willie L. Day | 5/5/69 |
| James H. Hill | 5/5/69 |
| Charles A. Smith | 5/5/69 |
| Lillie Belle Teal | 5/5/69 |
| Lula S. Courtney | 5/5/69 |
| Robert L. Smith | 5/5/69 |
| Pearl S. Hines | 5/5/69 |
| Juanita S. McLendon | 5/5/69 |
| Bessie Tift Hughes | 5/9/69 |
| Mamie S. Hollingsworth | 5/31/69 |
| Edward Banner | 6/7/69 |
| Louella Banner Shavers | 6/7/69 |
| Tommy Smith | 8/29/69 |
| James E. Day | 9/17/69 |
| Jerry Day | 10/21/69 |

**16.** Lula Smith Courtney deposition, pp. 30–31; Tommy Day deposition; Bernice Tift Newton deposition, pp. 21–22, 33; Charles A. Smith deposition, p. 24; O.L. McLendon deposition, p. 11; Carl Senior deposition, pp. 17–18.

**17.** Lula Smith Courtney deposition, p. 36; Bernice Tift Newton deposition.

**18.** *See, e.g.,* Lula E. Smith deposition, pp. 146–47; Jerry Day deposition, pp. 63–68; Robert Lee Smith deposition, pp. 17–18; Carl Senior deposition, p. 29.

**19.** Plaintiff's Exhibits A1–A15 are affidavits submitted by most of the Smith heirs or their estate representatives in support of the first motion for summary judgment. To an extent, these affida-

false certain of the court's factual assumptions which were drawn from plaintiff's affidavits.

■ The discrepancies between the affidavits and subsequent depositions are not simply differing views of evidence which should be considered by a trier of fact. If that were the case, the court would view the contents of the affidavits as true because it is obligated to view the evidence in the light most favorable to the non-moving party. Instead, the court must consider these affidavits in large part as sham affidavits, created solely to present a genuine issue of material fact in opposition to a motion for summary judgment. The affidavits and deposition testimony are inherently inconsistent. The affidavits do not merely clarify or add to the depositions, rather they are blatantly contradicted by the deposition testimony. Therefore, where the affidavits are clearly contradicted by the affiant's subsequent deposition testimony, the court will accept the deposition testimony as true and disregard that part of the affidavit as a sham. *See Van T. Junkins and Associates, Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir.1984).

The depositions reveal appreciable stretching of the truth. Plaintiffs' affidavits uniformly contend that Tommy Smith was a close relative to plaintiffs. Further, the affidavits testify that plaintiffs' were aware that Alex Boone was Tommy Smith's attorney and that they believed him to be representing their collective interests in the sale of the farm. Deposition testimony of numerous plaintiffs is in direct conflict with these affidavits.

Lula Courtney testified that no one ever told her that Mr. Boone was representing Tommy Smith. Lula Courtney deposition, pp. 64–65. She stated, with some equivocation, that she did not know who Boone was at the time the land was purchased. Courtney

deposition, pp. 52–56. *Contra* Courtney affidavit, paras. 11–12, 18. Further, Ms. Courtney stated that she was not present when the 50-year lease on the farm was signed, in direct conflict with plaintiff's answer to defendant's interrogatory. Courtney deposition, pp. 74–76.

Viola Griffin testified that she had not heard of Boone in 1968 or 1969, when the land transactions occurred. She had only heard of Boone "recently". Viola Griffin deposition, p. 27. Hence, the affidavit's assertion that Ms. Griffin thought Boone represented her, and the other Smith heirs, in 1968 is a sham. Viola Griffin affidavit, paras. 10–11.

Jerry Day's deposition testimony probably best approximated the assertions of the affidavits of any of the plaintiffs. He stated that although he never paid Boone or talked with him, he believed that Boone represented the Smith heirs because his uncle, W.C. Day, told him that Boone was their attorney and that he should sign the option agreement. Jerry Day deposition, pp. 38–40.

Tommy Day's only source of information concerning the sale was his uncle, W.C. Day, who told him to sign the option. Tommy Day deposition, pp. 23, 26. Tommy Day was unaware of Alex Boone. Day deposition, p. 28. *Contra* Tommy Day affidavit, para. 30.

In contrast to her earlier affidavit, Bernice Tift Newton testified that she did not, and still does not, know Alex Boone or whether he is an attorney. Newton deposition, pp. 26–27. *Contra* Newton affidavit, paras. 4–5. She stated that, other than one visit, she had no contact with her uncle, Tommy Smith, around the time of the sale. She had no phone and did not know his address. Newton deposition, p. 33.

In his deposition, Charles A. Smith stated that he did not know who Boone was and did

---

vits have been discredited. The affidavits of the heirs who remain as plaintiffs follow:

A2 Lula Courtney
A3 Viola Smith Griffin
A4 O.L. McLendon, representative of the estate of Juanita McLendon
A7 Jerry Day
A8 Mary E. Day, representative of the estate of W.C. Day

A9 Thomas L. Day
A11 Bernice Tift Newton
A12 Carl Senior, representative of the estate of Lillie Belle Teal
A13 Charles A. Smith
A14 Robert Lee Smith
A15 Bessie Cornelia Tift Hughes

not think Boone was his attorney. Charles A. Smith deposition, p. 38. *Contra* Charles A. Smith affidavit, paras. 11–12. However, he signed the option agreement because he trusted his uncle. Smith deposition, pp. 39–40, 45.

Robert Lee Smith, whose October 30, 1989, affidavit is identical to the one given by Charles A. Smith, testified that his uncle, Tommy Smith, told him that Boone was his (Tommy Smith's) attorney. Robert Lee Smith deposition, p. 25. Robert Lee Smith is uncertain when he learned of this representation, Smith deposition, pp. 29–30, but is certain that, in 1968 when he signed the option, he knew that Boone was not representing him. Smith deposition, p. 25. *Contra* Robert Lee Smith affidavit, paras. 11–12.

On behalf of Bessie C.S. Hughes, plaintiffs' counsel submitted an affidavit similar to the others, alleging that she relied upon Boone as her attorney. At her deposition, Ms. Hughes failed to remember selling the Georgia farmland which she received from her mother. Hughes deposition, p. 60.

O.L. McLendon, Mary Day, and Carl Senior were deposed because they represent the estates of deceased Smith heirs. The affidavit of O.L. McLendon states that he heard Tommy Smith tell Juanita McLendon, the affiant's wife, that Boone was their attorney, and that as a result of this conversation, she signed the option. McLendon affidavit, para. 11. In fact, O.L. McLendon testified that his wife generally did not speak with him concerning the sale, but that she mentioned Boone without discussing whether he represented her. McLendon deposition, pp. 15, 22. *Contra* McLendon affidavit. Moreover, although he never heard of "kaolin" on the property, he remembers seeing his wife and sister-in-law, Bea Smith, eat "chalk" from the farmland. McLendon deposition, p. 14.

Mary Day, as the representative of her husband W.C. Day, testified that she does not know what her husband knew about the Smith property and is unaware whether he was represented by a Georgia attorney. Mary Day deposition, pp. 27–28. She did verify her husband's signature on the option agreement. Mary Day deposition, p. 19.

Like the other representatives, Carl Senior knew little of what his mother, Lillie B. Teal, knew about the sale, Alex Boone, or Yara Engineering. Carl Senior deposition, pp. 37, 47, 53. The part of Senior's affidavit which swears that Lillie B. Teal thought Boone was her attorney and that she trusted him to represent her interests can not be accepted as evidence. *See* Senior affidavit, para. 11. Certainly a bald-faced assertion of what Ms. Teal thought, contradicted by the affiant's testimony, can not be accepted as true. *See* Fed.R.Evid. 602.

## II. DISCUSSION

Defendant moves a second time for summary judgment because of discrepancies between plaintiffs' affidavits filed in opposition to the first summary judgment motion and their later depositions. Many of the statements found in the affidavits are not based upon personal knowledge, and, therefore, can not serve as evidence in opposition to defendant's motion for summary judgment.

Already, the court has disregarded some of the affidavits because the affiants lacked personal knowledge.[20] Second, statements that Tommy Smith said that Alex Boone was his attorney,[21] cannot be used to prove that Alex Boone was Tommy Smith's attorney, although they may be used for other purposes. Fed.R.Evid. 801, 802. Third, the Georgia Dead Man's Statute, § 13–1603, excludes testimony concerning oral statements made by defendant's agents who are now deceased. The statute operates to exclude testimony regarding statements made by A.G. Bowman and Alex Boone, but not statements by Tommy Smith. *See McLendon,* 782 F.Supp. at 1558–59.

---

**20.** Several of the affidavits were made by the personal representatives of the Smith heirs who actually made the conveyances: O.L. McLendon for Juanita McLendon, Mary E. Day for W.C. Day, and Carl Senior for Lillie Belle Teal. Affidavits which assert that the deceased "knew" or "thought" something have been disregarded as lacking personal knowledge. Fed.R.Evid. 602.

**21.** The only credible evidence that Tommy Smith referred to Boone as his attorney is testimony of plaintiffs Jerry Day and Robert Lee Smith.

## A. The Fraud Claims

■ Plaintiffs allege that defendant intentionally concealed material facts about the Smith property to the plaintiffs when under a duty to disclose material information. To establish a prima facie case of fraudulent concealment, plaintiffs must prove the following elements: (1) that defendant made a false representation of a material fact or concealed a material fact when under a duty to disclose; (2) that defendant knew the representation to be false or omission to be true when he made it; (3) that defendant made the representation or omission with the intent and purpose of deceiving plaintiff; (4) that plaintiff justifiably relied on the representation or omission; and (5) that plaintiff suffered an injury as a result of such reliance. *Hubbard v. Stewart,* 651 F.Supp. 294 (M.D.Ga.1987); *McLendon v. Galloway,* 216 Ga. 261, 116 S.E.2d 208 (1960). O.C.G.A. § 23–2–53 provides in pertinent part, "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud." Plaintiffs allege that defendant's duty arose from either (1) a confidential relationship between defendant's agent, Tommy Smith, and plaintiffs or (2) the particular circumstances. O.C.G.A. § 23–2–53.

■ Defendant argues that no material facts are in dispute concerning the first element of fraud and that defendants are entitled to judgment as a matter of law. Defendant contends the evidence is insufficient to show the existence of a duty on defendant to disclose the presence of kaolin on the property to the Smith heirs.

■ Ordinarily, a purchaser owes the vendor no duty to disclose facts which the purchaser knows affect the value of the property. *See McLendon,* 782 F.Supp. at 1561; *Georgia Real Estate Comm'n v. Brown,* 152 Ga.App. 323, 262 S.E.2d 596 (1979). However, a duty to disclose may "arise from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23–2–53. The court found that the affidavits submitted in opposition to the first summary judgment motion were sufficient to create a jury issue as to whether a duty arose either from a confidential relationship between defendant and the Smith

heirs or from the circumstances of the case. Now the court is asked to apply the legal standards to more fully developed facts, as discovered through depositions.

### 1. The Confidential Relationship

Under O.C.G.A. § 23–2–58,

Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc. (emphasis added.)

The court has previously rejected the assertion that a confidential relationship arose from the tenancy in common between plaintiffs and either defendant Georgia Kaolin or their subsidiary. Nor did a confidential relationship arise in the guise of attorney/client, because, except for one isolated incident—the conveyance of Evie Barksdale Solomon's interest to Tommy Smith,—there is no competent evidence to establish that Alex Boone represented Tommy Smith or the other Smith heirs between 1967 and 1969. The only situation from which a confidential relationship can be inferred is one where Tommy Smith was an agent to both defendant and the other Smith heirs. The agent's (Tommy Smith's) confidential relationship with his relatives would be attributed to defendant, and the duty of disclosure would arise from the confidential relationship. Thus, defendant would not be obligated to disclose facts to Tommy Smith himself.

■ The court does not believe the evidence has changed with regard to whether an agency relationship existed between Tommy Smith and defendant. As previously noted, "defendant agreed to compensate Tommy Smith for his aid in getting the options signed by all of the Smith heirs. Tommy Smith was paid $1000 compensation in addition to eight years of living rent free on the old Smith property." *McLendon,* 782 F.Supp. at 1564. As defendant's agent, any

special relationship which Tommy Smith had with the other Smith heirs which would aid the principal is imputed to the principal. *Capriulo v. Bankers Life Company,* 178 Ga. App. 635, 344 S.E.2d 430 (1986) (where an agent's special relationship with a third party aids the corporation, the relationship is imputed to the corporation).

■ The more difficult question is whether a jury could infer that Tommy Smith had a confidential relationship with the Smith heirs from which a duty of disclosure flowed. Three relationships between Tommy Smith and the heirs were potentially confidential; the relationships of agency, family, and cotenancy. First, a jury could find that Tommy Smith was acting as an agent for the other Smith heirs in negotiating and managing the details of the sale. An agency relationship can be confidential when one exercises controlling influence over the actions of another. O.C.G.A. § 23–2–58.

■ Second, Tommy Smith was related to the other Smith heirs. However, a confidential relationship is not presumed from a family relationship. *Crawford v. Crawford,* 134 Ga. 114, 119, 67 S.E. 673 (1910) (there is no presumption that a confidential relationship exists between brothers). Therefore, plaintiffs must show a confidential relationship through affirmative evidence rather than relying on mere family ties. *Limoli v. First Georgia Bank,* 147 Ga.App. 755, 250 S.E.2d 155 (1978), *cited in Owen v. Mobley Construction Company,* 171 Ga.App. 462, 320 S.E.2d 255 (1984). Plaintiffs have failed to present any evidence of confidentiality or mutual confidence. "The mere fact that one reposes trust and confidence in another does not create a confidential relationship." *Limoli,* 147 Ga.App. at 758, 250 S.E.2d 155, *quoted in Owen,* 171 Ga.App. at 463, 320 S.E.2d at 256–57.

■ Third, Tommy Smith was a cotenant with the other Smith heirs, which was established from the same instrument or event, the death of Edward D. Smith. To

some extent, tenants in common have a relationship of confidentiality. *Fuller v. McBurrows,* 229 Ga. 422, 425, 192 S.E.2d 144, 146 (1972). However, this relationship does not prevent a cotenant from buying another cotenant's interest in the property as if he were buying property from a stranger. 20 Am-Jur2d *Cotenancy and Joint Ownership* § 93 (1965). The confidential relationship "does not preclude them from contracting with each other in regard to all ordinary matters, including the subject matter of the cotenancy itself." *Id.* No Georgia case has addressed the specific issue of the cotenants having disparate knowledge of the value of the property; however, the cotenancy does not appear to add an additional burden of disclosure beyond what is required under the particular circumstances.[22] Therefore, the cotenancy does not create a confidential relationship from which a duty of disclosure was owed.

■ Nevertheless, a duty of disclosure can be inferred solely from the agency relationship. The agency relationship could create a duty to disclose on behalf of defendant to all of the Smith heirs who relied on Tommy Smith as their agent such that he had a controlling influence over their will. O.C.G.A. § 23–2–53.

### 2. The Particular Circumstances

■ Additionally, a duty to disclose may arise "from the particular circumstances of the case." O.C.G.A. § 23–2–53. Thus, even if a jury determined that defendant, through its agent, was not in a confidential relationship with the Smith heirs, they could find that defendant had a duty to disclose due to the particular circumstances surrounding the transaction.

■ The only fact, pertinent to this analysis, which has come to light since the earlier motion for summary judgment is that plaintiffs, except Jerry Day and Robert Lee Smith,[23] did not believe that Boone was representing them or their uncle, Tommy Smith, in the transaction. However, a jury could

---

**22.** *See infra.*

**23.** In the case of Jerry Day, he has not presented any credible evidence that defendant was respon-

sible for his mistaken belief that Boone was representing Tommy Smith in the sale.

view Tommy Smith as a "double agent," working to close the deal on both sides. Moreover, defendant's identity was kept secret, as were the results of drilling on the land.

Hence, the circumstances have not changed so significantly as to take the question away from the jury. Plaintiffs' due care in discovering any fraud is the central issue. "While concealment of material facts may amount to fraud when the concealment is of intrinsic qualities the other party could not discover by the exercise of ordinary care, in an armslength business or contractual relationship there is no obligation to disclose information which is equally available to both parties. (citations omitted.) Under such circumstances, actionable fraud cannot be shown unless plaintiff exercised due care to discover the fraud." *Southern Intermodal Logistics, Inc. v. Smith & Kelly Company*, 190 Ga.App. 584, 586, 379 S.E.2d 612, 614 (1989). Plaintiffs' due care remains a disputed issue for the jury.

In conclusion, defendant's motion for summary judgment on the merits of plaintiffs' claims is **DENIED.**

### B. The Statute of Limitations

 Defendant also renews its motion for summary judgment based on the statute of limitations bar. Plaintiffs' claims have both equitable and legal components.[24] Where a court has concurrent jurisdiction of legal and equitable claims, the claims are governed by the statute of limitations pertaining to the action at law. *Baker v. Cummings*, 169 U.S. 189, 18 S.Ct. 367, 42 L.Ed. 711 (1898), *cited in* 27 AmJur2d, *Equity* § 158 (1966). Accordingly, the four-year statute of limitations period provided in O.C.G.A. § 9–3–31 applies to plaintiffs' claims

both equitable and legal. Further, the court cannot employ the doctrine of laches where it has concurrent jurisdiction over legal and equitable claims. 27 AmJur2d, *Equity* § 160 (1966).

 As the allegedly fraudulent conveyances took place in 1969, the statute of limitations would bar plaintiffs' cause of action unless plaintiffs can prove that the statute was tolled from 1969 until the lawsuit was filed in August 1985.[25] Georgia law provides for tolling the statute of limitations due to fraud by the defendant.[26] Where "actual fraud is the gravamen of the action ... the statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered. No other independent fraudulent act is required to toll the statute. Silence is treated as a continuation of the original act of fraud." *Shipman v. Horizon Corporation*, 245 Ga. 808, 267 S.E.2d 244, 246 (1980). Actual fraud, rather than constructive fraud, operates to toll the statute of limitations under O.C.G.A. § 9–3–96. Here, plaintiffs allege actual fraud with intent to deceive. Plaintiffs claim that a duty to disclose arose from a confidential relationship between defendant and plaintiffs or from the circumstances, and that defendant intentionally sought to deceive the Smith heirs through fraudulently concealing the presence of kaolin on the property.

 Once the statute of limitations has been tolled through actual fraud, the plaintiffs must exercise reasonable diligence to discover the fraud in order for the statute of limitations to remain tolled. O.C.G.A. § 9–3–96. As an exception to the Georgia statute of limitations, the tolling statute should be strictly construed.[27] *Bates v. Met-*

---

**24.** Plaintiffs' prayer for the court to cancel the deeds transferring the land to defendant seeks equitable relief. *Knight v. Dep't of Transp.*, 239 Ga. 368, 236 S.E.2d 826 (1977); *Chosewood v. Jones*, 146 Ga. 804, 92 S.E. 646 (1917).

**25.** A four-year statute of limitations applies to actions seeking damages for fraud. O.C.G.A. § 9–3–31.

**26.** O.C.G.A. § 9–3–96 provides: "If the defendant or those under whom he claims are guilty of

a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."

**27.** The court notes that federal court decisions deal generally with the federal tolling principals rather than that of Georgia. In a diversity case, state law governs the tolling of the statute of limitations. 4 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1056, p. 179 (1987).

*ropolitan Transit Sys. Inc.*, 128 Ga.App. 720, 721, 197 S.E.2d 781, 782 (1973). A plaintiff has a duty to exercise diligence to discover the fraud in order to toll the statute; mere ignorance of the fraud is not sufficient. *Morris v. Johnstone*, 172 Ga. 598, 158 S.E. 308 (1931). Whether a party exercised due diligence in discovering the alleged fraud is normally a jury question. *Brown v. Brown*, 209 Ga. 620, 75 S.E.2d 13 (1953); 37 Am. Jur.2d *Fraud and Deceit* § 408 (1968) (whether fraud should have been discovered before it actually was discovered is a factual question). Nevertheless, in order for the issue to go before the jury, the evidence must at least colorably show that plaintiffs' exercised reasonable diligence in discovering the fraud. *Brooks v. Freeport Kaolin Co.*, 253 Ga. 678, 324 S.E.2d 170 (1985) (using reasonable diligence, landowner, who executed mineral lease on his property in 1947, should have discovered any fraud on the part of the lessee before filing suit in 1982).

■ Defendant argues that plaintiffs' depositions reveal an utter lack of diligence to discover any fraud in the 1969 sale. Plaintiffs did not discover the fraud until Robert L. Watkins told them about it.[28] Of concern is the fact that the option agreements, in plain language, provided that the Purchaser, Boone, "shall have the right to enter upon said lands to drill, dig test pits, remove samples and do all other things necessary and incidental to the thorough prospecting of said lands for the purpose of determining the quantity and quality of kaolin and all other minerals in, on or upon said lands." A reasonable person should have been alerted after reading this paragraph that the land potentially contained a valuable mineral. Despite the fact that plaintiffs did not know that Boone was a corporate representative, this paragraph of the agreement should have alerted a reader to the potential value of the land. However, most of the plaintiffs testified that they did not read the options before signing them because of their trust in Tommy Smith.

In general, a finder of fact should decide whether this conduct was reasonable under the circumstances. The court has given considerable thought to this issue and concludes that summary judgment should not be granted on the statute of limitations issue. Although plaintiffs did not investigate the circumstances surrounding the sale, a reasonable juror may decide that plaintiffs were not unreasonable. The court can not say as a matter of law that plaintiffs were unreasonable in failing to read or understand the option agreement or to otherwise discover any fraud. *See Smith v. Duff and Phelps*, 5 F.3d 488 (11th Cir.1993); *Durham v. Business Management Associates*, 847 F.2d 1505, 1508–10 (11th Cir.1988).

■ Additionally, the parties dispute whether any failure to use reasonable diligence is excused due to a confidential relationship between plaintiff and defendant.[29] A failure to exercise reasonable diligence may be excused if a relationship of trust and confidence exists between the parties. *Shipman v. Horizon Corp.*, 245 Ga. 808, 267 S.E.2d 244 (1980); *Lowe v. Presley*, 86 Ga. App. 328, 71 S.E.2d 730 (1952). Defendant urges that any confidential relationship between defendant and plaintiffs which may be inferred ended with the transaction. Plaintiffs concede that any special relationship ended in 1969, but argue that case law does not require the confidentiality to continue past the transaction in order to excuse a lack of diligence.

■ Were the jury to determine that plaintiffs failed to exercise reasonable diligence, then the absence of a confidential relationship would likely bar the claim. "[S]o long as the [confidential] relationship continues unrepudiated, there is nothing to put the injured party on inquiry, and he can not be said to have failed to use due diligence in detecting the fraud." 37 Am.Jur.2d *Fraud and Deceit* § 409 (1968) (emphasis added).

Whether a *confidential relationship* exists to excuse the failure to use diligence to ascertain fraud is a separate evaluation from

---

28. *See* Deposition of Robert Lee Smith, pp. 17–18; Deposition of Jerry Day, pp. 63–64; Deposition of Carl Senior, pp. 29.

29. The cessation of the special relationship is only material if the jury determines that plaintiffs failed to exercise reasonable diligence.

the determination that a duty to disclose arises from a special relationship. Here an agency relationship may be found to obligate defendant to reveal material facts to plaintiffs; however, this relationship does not necessarily excuse plaintiffs' failure to use reasonable diligence in future years. The Georgia Supreme Court reasoned that the "failure to exercise reasonable diligence may be excused if a relationship of trust and confidence exists between the parties." *Shipman v. Horizon Corp.,* 245 Ga. 808, 808–809, 267 S.E.2d 244 (1980). *Shipman* cites to two cases for that proposition, *Kirkley v. Sharp,* 98 Ga. 484, 25 S.E. 562 (1896), and *Bennett v. Bird,* 139 Ga. 25, 76 S.E. 568 (1912).

In *Kirkley v. Sharp,*[30] the court held that a widow was not barred from bringing suit against a friend of her deceased husband because a relationship of trust and confidence existed between them (the widow and friend). Although the fraudulent transaction occurred more than four years prior to filing of the lawsuit, the relationship of trust continued until the widow learned of the fraud. Thus, the statute of limitations was tolled until that discovery.

In *Bennett v. Bird,*[31] plaintiff was barred from suing her step-father for money which he fraudulently withheld from her because she neglected to use reasonable effort to learn of the misrepresentation. The court acknowledged that plaintiff was in a confidential relationship with her step-father at the time of the transaction; however, this confidential relationship did not excuse her failure to use due diligence. In effect, once the special relationship ended, plaintiff was charged with the duty of reasonable diligence.

A more recent case, *Lowe v. Presley,* 86 Ga.App. 328, 71 S.E.2d 730 (1952), endorses the confidential relationship exception. In *Lowe v. Presley,* a client sued a defendant for misrepresenting himself as an attorney. The court held that the four-year statute of limitations was tolled until plaintiff's discovery of the fraud because of the confidentiality between an attorney and client. *Id.* at 334, 71 S.E.2d 730. The attorney/client relationship continued until plaintiff learned of the deception.

An examination of Georgia law does not reveal a case dealing with the exact question posed to this court. The most analogous situation is found in *Bennett v. Bird,* but the court did not explicitly hold that a confidential relationship had to continue in order to excuse a continued failure to use diligence. Nevertheless, reason dictates such a rule. The reason for the exception is that one is not necessarily expected to question the actions of a person with whom he has a confidential relationship. It is reasonable for one not to question the advice of his attorney or family doctor because of the bond of trust between the professional and his client. The bond presumably makes it harder for the victim to ascertain the wrong. However, once that bond has dissipated, blind trust is no longer reasonable and one is expected to use reasonable diligence to discover any wrongdoing. To hold that the existence of a confidential relationship at the time of the fraud forever excuses the person from exercising reasonable diligence would toll the limitations periods until the victim actually discovers the fraud, regardless of the reasonableness of his actions. Hence, the statute of limitations would be meaningless in all fraud cases involving confidential relationships however short-lived.

## III. CONCLUSION

The court finds that plaintiffs have presented a prima facie case of intentional fraudulent concealment against defendant and whether a duty of disclosure existed is a disputed factual matter. The issue of whether their claims are barred by the statute of limitations cannot be decided on summary judgment. Accordingly, defendant's second motion for summary judgment is **DENIED.**

**SO ORDERED.**

**30.** 98 Ga. 484, 25 S.E. 562 (1896).

**31.** 139 Ga. 25, 76 S.E. 568 (1912).